**NATIONAL BY–PRODUCTS, INC.**

v.

**The UNITED STATES.**

No. 431–65.

United States Court of Claims.
Jan. 24, 1969.

B. A. Webster, Des Moines, Iowa, attorney of record, for plaintiff. John Gamble and Robert A. Gamble, Des Moines, Iowa, of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Clyde O. Martz, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

DAVIS, Judge.*

The plaintiff, owner of property on the south bank of Papillion Creek, a tributary of the Missouri River near Omaha, Nebraska, claims that the Government breached its informal contract to construct a levee on the plaintiff's side of the creek (south, or right) when it built one on the facing side (north, or left) to protect Offutt Air Force Base from occasional floods, with the result that the plaintiff's property was flooded twice in consecutive months in 1964. Alternatively, plaintiff contends that, by constructing its levee on the left side of the creek without a corresponding one on the right bank, the Government knowingly induced south-bank floods and thereby took a flowage easement over plaintiff's property for which the company is entitled to just compensation. The defendant answers that there was no contract made, that its agents lacked authority to agree to construct a levee on plaintiff's side of the creek, and that the Government is not estopped to deny the existence of such an agreement or its agent's authority. The defendant also asserts that there was no taking, that the damage to plaintiff's property was "consequential", and that plaintiff's cause of action—if any—sounds in tort, beyond this court's jurisdiction, and, in any case, is barred by 33 U.S.C. § 702c (1964) which relieves the United States from liability for flood damage in certain circumstances.

## I.

To help in solving as many of these problems as we have to face, we open with a free-hand diagram of the area, put together from a number of the exhibits. Plaintiff National By-Products, Inc.'s properties (prior to the dealings involved in this case) are shaded, with its various buildings and three water wells indicated; it owned land on both sides of Papillion Creek. On the west this property is bounded by the track embankment of the Missouri-Pacific Railroad (MoPac) and a small plot owned by Herman Platt. On the east it abuts the embankment of the Chicago, Burlington & Quincy Railroad (CB&Q). This section of the creek is bounded by the CB&Q railroad bridge on the east and a county road bridge on the west, and is approximately 2,400 feet in length. Further upstream (i. e., to the northwest) there are two additional bridges over the creek, one for the MoPac railroad, the other for U. S. Highway 73–75.

* The court is beholden to Trial Commissioner C. Murray Bernhardt for his opinion which reaches the same conclusion but on other grounds.

The entire reach of the creek shown on the map is about 9,000 feet long. Offutt Field (home of the Strategic Air Command (SAC), vital to the nation's security), lies north of Papillion Creek, and is separated from it by land owned by various individuals, mostly members of the Platt family.

Papillion Creek flows roughly southeast (from the top to the bottom of the diagram) at this point; it turns due east at approximately the lower edge of the diagram and empties into the Missouri River about 4½ miles southeast of plaintiff's property. In this area the Missouri flows substantially from north to

south. In its natural state, Papillion Creek was sinuous with a relatively narrow bottom and sloping, wooded banks. Flooding was relatively frequent and intense, but of short duration. Prior to 1963 the Creek was lined on both sides with farm levees commenced in 1910, varying in height from 6 to 12 feet and composed of uncompacted spoil dredged from the creek bed. They hugged the

creek banks with little or no setback, and provided a channel capacity of approximately 10,500 c. f. s. (cubic feet per second) upstream from plaintiff's property.

Floods of from 10,150 to 15,800 c. f. s. occurred on six occasions from July 1948 to June 1960. The one in August 1959 breached the north-bank farm levee just below the MoPac bridge shown on the

diagram, at or near the site of north-bank levee breaches in prior floods of 1917 and 1932, and as on past occasions flooded a large portion of the Offutt Field area which was the natural flood plain of the overflow en route to the Missouri River. Emergency repairs were made at the point of the breach by the Corps of Engineers.

The Flood Control Acts of 1941 and 1944 proposed a civil works project for the prevention of floods along the Missouri River, involving the construction of dams and levees, including dikes along both sides of Papillion Creek. The Papillion Creek levees were part of two units, R–616 and R–613, each unit comprising a levee on the west bank of the Missouri and a "tie-back" portion along one side of Papillion Creek, connecting the Missouri River levee with high ground upstream on the creek. As authorized by Congress, each unit required assurances of local cooperation—providing of all lands, easements and rights-of-ways; saving the government free from all claims for damage; and maintaining the structures in the future. These assurances were originally given; however, the Korean conflict in the early 1950's caused suspension of the project. Afterwards, dams were constructed on the upper Missouri, decreasing the need for those portions of levee units R–616 and R–613 on the Missouri itself. In addition, the construction of Offutt Field reduced the number of farm acres along Papillion Creek on which the local drainage district could levy assessments. For these reasons the local assurances of co-operation were withdrawn for the whole unit, although there remained sentiment for the construction of the "tie-back" portions if they could be separately authorized. But no such partial unit was approved during the relevant time.

The flood in August 1959 which over-ran Offutt Field revived the interest of the Corps of Engineers in building levees along Papillion Creek, now as a military project to protect the SAC base. As the preliminary interchanges between the Corps of Engineers and the Air Force began,[1] a difference in approach surfaced which was to continue throughout the planning stage. The Corps of Engineers, oriented to general civil works flood control projects, considered that a levee constructed only on the left (north) bank would increase the likelihood of flooding on the right (south) bank, with consequent claims for damages. The Corps therefore urged erection of the "tie-back" portions of the already designed levees, protecting both banks of the creek. The Air Force, interested in the more limited objective of protecting Offutt at the lowest possible cost, and feeling that it could not justify the expenditure of military funds for the protection of private property, refused to authorize the design of any improvements on the right side.

In September 1961 the Corps requested permission to add a right-bank portion to the design, in order to appease local interests opposed to the proposed left-bank levee,[2] which appears at this time to have incorporated substantially the plan of the ultimately constructed Offutt levee—a levee set back from the creek as much as 400 feet, designed to contain "once-per-century" (1% probability) floods of 28,500 c. f. s., with an additional two foot freeboard. Permission for the requested additional authority was denied by the Air Force.

Congressional authorization for the construction of an Offutt levee as a military project was contained in Public Law 87–57, June 27, 1961, 75 Stat. 96, 106, "To authorize certain construction at military installations, and for other purposes". This legislation earmarked $541,000 for real estate acquisitions, utility installations, and ground improve-

1. It has been common for the Army Corps of Engineers to do construction work for the Air Force. See, e.g., J. A. Jones Constr. Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968).

2. Concern at this time was focused on a portion of the creek above the Highway 73–75 bridge well upstream of plaintiff's property.

ments. The Air Force considered the Offutt levee to be strictly a military project, as opposed to a civil works flood control project, although it was designed to fit into the eventual overall flood control program. Accordingly, the Corps of Engineers did not include the Offutt levee in its July 1962 engineering report submitted to Congress concerning the proposed development of flood control measures on Papillion Creek, but referred to it as a military project which had recently been approved for construction.

The Engineers again requested the Air Force, in October 1961, to expand the project to cover the right bank. The CB&Q had expressed opposition to the proposed levee, and refused to cooperate by granting an easement or license to tie the levee into its rail embankment because of the increased danger to its tracks on the opposite (right) bank which would be shielded only by the more vulnerable farm levees. The railroad later estimated that without right-bank levee protection it would be necessary to raise its entire bridge embankment to allow water to flow under it in times of flooding, at an expense of $85,-000, plus additional liability to damage claims by farmers east of its tracks who would then be subject to greater flooding. The Corps suggested the inclusion of a right-bank levee as a means for obviating the CB&Q objections. The Air Force Regional Civil Engineer again refused.

During March 1962 the Corps personnel developed a compromise plan for dissolving the CB&Q objections in a way acceptable to the Air Force. The railroad would be paid a large enough sum for its property to be acquired by the Government so as to include an amount sufficient for the CB&Q to build a levee on the right bank to protect its embankment. This extra payment would be justified to the Air Force as a reasonable estimate of the severance damages suffered by the railroad in the taking of its land. In fact, this appeared to be the cheapest method for the CB&Q to maintain the same degree of protection which it enjoyed prior to the new left-bank levee. The Air Force authorized the Corps to design a right-bank levee for the CB&Q, and to begin negotiations on this basis. When approached, the CB&Q agreed in principle, but refused to assume the responsibility of building the levee itself, due to the potential liability. The most likely body to assume the job of construction was the local Eastern Sarpy County Drainage District; upon investigation, however, the Corps found this body defunct. Nevertheless, the difficulty was not considered insuperable, and negotiations continued, with the Corps feeling that it had reached an agreement with the railroad on May 28, 1962. In a June 1962 directive the Air Force agreed to pay not more than $15,000 to the CB&Q, providing the railroad took full responsibility for constructing the right-bank facilities. The Air Force considered this a "connection charge" properly allocable to the cost of the Offutt flood protection project.

As soon as this directive reached the District Office of the Engineers Corps, it began negotiating with other landowners for purchase of the necessary left-bank land and permission on behalf of some yet-to-be-determined entity to construct a comparable structure on the right bank. Two owners, in addition to the CB&Q, held property on both banks —plaintiff National By-Products, Inc. and Herman Platt. Both had been contacted in April 1962, soon after the first talks with the CB&Q on the compromise plan, to test their willingness to hold the Government harmless from future maintenance of a right-bank levee. Both seemed agreeable at that time, although Platt showed some displeasure with the planned settlement for his left-bank lands.[3] On June 20, 1962, plaintiff's local managers, Messrs. Kruger and Wasser, met with M. B. Cottrell of the

---

3. The government negotiator suggested that Platt's consent to the right-bank work be obtained before discussion of payment for his left-bank interests began.

Corps' local Real Estate Division and reached an agreement on terms for the Government's purchase of a portion of the company's land needed in the construction of the left-bank levee [4] and its donation of a right-of-entry for the construction of a levee on its own right-bank property. The details of this meeting will be discussed in Part II of this opinion; here it suffices that plaintiff's representatives left the meeting with the impression that the Government had undertaken to build, or have someone else build, a right-bank levee for plaintiff's protection, while the Government's agent had no such understanding or intention. All later events were interpreted by both parties in accordance with their original, opposed understandings. Defendant prepared two separate instruments for plaintiff to execute, one dealing with acquisition of the left-bank tract, the other with a right-of-way for a right-bank levee. Plaintiff read them as one contract, with cross-obligations. The Government subsequently sought an extension of the "Offer To Sell" By-Products' left-bank land, and plaintiff again interpreted the extension as including an undertaking on the Government's part to build a right-bank levee. When the "Offer To Sell" was accepted by the defendant on October 26, 1962 and when occupancy was demanded on October 29, plaintiff was still under the impression that the Government was going to build its levee, or see that it was built, even though it knew by this time that some difficulties had arisen. In December 1962 it learned from the CB&Q, for the first time, that the right-bank levee was not in the government contract. However, even when it executed a warranty deed for its left-bank property in February 1963, it still considered that the right-bank levee would be built as soon as some technicalities were overcome.

In the meantime Herman Platt had adamantly refused to grant a right-of-entry to his right-bank property for the construction of a levee. He was much more concerned with the amount he was to be compensated for his left-bank lands than in the protection of this small five acre right-bank tract of farm land, and he refused to cooperate in any way until the Government offered him what he thought his left-bank land was worth —a figure which the Government considered exorbitant. Plaintiff was asked to and did attempt to persuade Platt to grant the right-bank authorization, but failed. Platt's obstinacy stymied the whole right-bank project. Without permission to connect the right-bank levee to the embankment of the MoPac railroad, across Platt's land, the CB&Q could not be protected. Without protection for its right-side embankment, the CB&Q refused to cooperate, and the Government was most reluctant to condemn the railroad's property. Platt's left-bank property could have been condemned and the Offutt side of the project begun, but under the limited authorization, on which the Air Force insisted from the beginning of the planning of the Offutt flood control project, the Engineers could not condemn Platt's right-bank land. The CB&Q railroad, moreover, refused to exercise its power of eminent domain for fear that it would thereby incur responsibility, and hence liability, for the right-bank levee.

In this predicament, the Corps again requested the Air Force for a revised directive allowing it to expand the proj-

---

4. The evidence indicates that a portion of the tract acquired from plaintiff actually lies on the *right* bank, and that improvements were made to the CB&Q bridge on the right bank in conjunction with the left-bank construction. See finding 14, n. 2. Although the issues of the Government's authority to purchase land and make improvements to private property on the right bank are central to this case, neither party excepts to the trial commissioner's finding that the land purchased from plaintiff lay entirely on the left bank, or otherwise relies on the true facts. We must assume, therefore, that the activities on the right bank were merely incidental and integral to the left-bank construction, and should be treated as left-bank activities.

ect to the right bank and condemn an easement on Platt's right-bank land. It argued that the Air Force had recognized a legal principle for so doing in its agreement to pay the CB&Q an amount sufficient to construct the right-bank levee. Again, and for the last time, the Air Force denied the request in mid-September 1962, directing that the necessary left-bank interest of the CB&Q be condemned if an agreement could not be reached expeditiously. The Corps made a final offer to the CB&Q of $16,500 for the necessary licenses, which included enough for the railroad to build the right-bank levee, and then on October 25th condemned the railroad's property, depositing the $16,500 in court as just compensation. Platt's left-bank lands were also condemned.

With the needed left-bank tracts all acquired, the Offutt levee on the left bank was commenced in the winter of 1962–1963 and completed in the fall of 1963. The right bank remained unchanged.

A flood estimated at 18,300 c. f. s. occurred May 25–26, 1964, which overtopped and washed out a portion of the old right-bank levee bordering plaintiff's property at a point 100–200 feet upstream from the CB&Q bridge, and passed over plaintiff's property causing substantial damage to its rendering plant, buildings, equipment and inventory, and also damaging the CB&Q right-of-way south of the creek bordering plaintiff's property on the east. After that flood subsided, another and more serious flood occurred June 16–17, 1964, when the flow in the creek peaked at a record 37,000 c. f. s. and again overtopped and washed through the old farm levee protecting plaintiff's property at the same location as the flood of the previous month. Plaintiff's property and plant were again inundated as before, causing less damage, however, because the plant had not by that time been fully restored to operation since the May flood and inventories had been reduced. The newly constructed Offutt levee on the left bank contained and withstood both the May and June floods, and protected the field as designed.

If a right-bank levee of equal height and strength to the new Offutt levee on the left side of the creek had been in place at the time of the May 1964 flood, it is reasonable to conclude that the right-bank levee would not have been breached or overtopped and the plaintiff would not at that time have sustained the damage to its property that it did suffer. However, given the same hypothesis, the June 1964 flood would have overtopped the dikes on both sides of the creek and would have flooded plaintiff's property.

Had the new Offutt levee not been in position at the time of the May 1964 flood, it is reasonable to infer that on that occasion the right-bank levee protecting plaintiff's property would not have been breached or overtopped and that plaintiff's property would not have been flooded. Instead, the flood would have breached the old left-bank levee at one or more places upstream from plaintiff's property and would thereby have so reduced the level and pressure of floodwaters against the levee bordering plaintiff's property as to have left it unbreached. In the absence of the new Offutt levee the June 1964 flood, because of its unprecedented volume, would in all likelihood have overtopped and breached the old farm levees on both sides of this section of the creek.

The May and June 1964 floods accented so graphically the need for a right-bank levee that all parties got together soon afterwards and agreed that one be constructed without delay. Mr. Platt, the plaintiff, the CB&Q and the MoPac gave the necessary permissions to enter their respective properties for this purpose, the CB&Q contributed $12,000 towards it, and Sarpy County agreed to sponsor the project for construction and maintenance of a right-bank levee. One was then constructed in accordance with the plans originally drawn by the Corps of Engineers.

## II.

In plaintiff's contract claim we have, as we shall see, the very model of one of the most ancient forms of consensual dispute—two parties sign the same papers or discuss the same subject, the one thinking he is consenting to a clear set of obligations, the other perceiving a different agreement, each having reasonable support for his own view, and neither realizing the other's contrary position. Cf. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963).

■ For the unfortunate transactions in this mold, the law has developed general solutions which conform to our current sense of justice. Before a representation can be contractually binding, it must be in the form of a promise or undertaking—even though that promise may relate to a state of facts over which the promisor has no power of determination, such as a warranty, see 1 Corbin on Contracts § 14 (1963)—and not a mere statement of intention, opinion, or prediction. This is the idea expressed in the draft of the Restatement (Second) of Contracts, in its definition of a promise:

> § 2. Promise; Promisor; Promisee; Beneficiary.
>
> (1) A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.[5]

The comments distinguish such an undertaking from "mere statements of intention", and from "a statement of opinion or a mere prediction of future events."[6]

Comment *b* to § 2 is much to the point:

> *b. Manifestation of intention.* Many contract disputes arise because different people attach different meanings to the same words and conduct. The phrase "manifestation of intention" adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention. A promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct. Rules governing cases where the promisee could reasonably draw more than one inference as to the promisor's intention are stated in connection with the acceptance of offers (see §§ 21 and 21A), in Chapter 9 on the scope and meaning of contracts, and in Chapter 17 on mistake.[7]

So also is § 21A, which takes account of differing responsibility for misconceptions:

> § 21A. Effect of Misunderstanding.
>
> (1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and
>
> (a) neither party knows or has reason to know the meaning attached by the other; or
>
> (b) each party knows or each party has reason to know the meaning attached by the other.
>
> (2) The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if
>
> (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or
>
> (b) that party has no reason to know of any different meaning attached by the other, and the other

---

5. Restatement (Second) of Contracts § 2 (Tent.Draft No. 1, 1964).

6. Restatement (Second) of Contracts § 2, comments *e* and *f* (Tent.Draft No. 1, 1964).

7. Chapters 9 and 17 have not yet been revised by the American Law Institute.

has reason to know the meaning attached by the first party.

■ Under these principles, for a government representation that a right-bank levee would be built to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention. If the only reasonable interpretation of the Government's actual representation, in light of the circumstances, is that it was an undertaking, then it is bound. If, however, the Government's statement was subject to two reasonable interpretations, one that it was an undertaking, the other that it was a prediction, and the parties chose opposite ones, then there is no contract covering that representation, unless one side either knew or should have known the meaning attached to it by the other. The Government prevails, in other words, if we find that the parties arrived at a contract which provided for no right-bank levee, or that they reached no mutual agreement at all on this issue.

■ As usual, the greatest difficulty comes, not in formulating the governing principles, but in fitting them to the stubborn but gossamer "facts". In this struggle we have always to remember that the plaintiff, as plaintiff, has the burden of persuasion. Likewise, we cannot allow sympathy for the company's flood loss to push us into treating the United States as an insurer or "big daddy". Nor is this a case in which the Government has all the bargaining power on its side, and may therefore be held to a higher responsibility than in more balanced arrangements. This is an ordinary common law contract action, involving a relatively simple land transaction, and we recount and analyze the history on that basis.

There had been contacts between plaintiff's and defendant's agents prior to 1962. The record contains a document dated December 27, 1961, in which Carl Wasser, superintendent of plaintiff's plant on the creek, granted the Government permission to enter upon its land "for the purpose of permanently placing excess spoil along the right bank of Papillion Creek". This paper probably relates to a time when the Air Force was considering cutting back its plans for left-bank construction to a levee no higher than the existing farm levees. The agreement is wholly typewritten, short, and in the form of a letter to the District Engineer. It specifically designates the Government as the entity to which the right is given. No payment was to be made for this use of plaintiff's land.

■ The next contact took place on April 25, 1962, when representatives of the Engineers Corps discussed the construction of a right-bank levee with Carl Wasser and elicited his agreement to recommend to his superiors that the company execute an agreement holding the Government harmless from future maintenance of such a levee. After the consent of the Air Force to the CB&Q compromise was obtained, see Part I, supra, plaintiff was approached to reach a final agreement on the purchase of land necessary for left-bank construction and the donation of right-bank land. On June 20, Wasser and James Kruger, district manager, met with M. B. Cottrell of the Corps of Engineers at the National By-Products plant. They discussed both the left- and right-bank prospects, the proposal of the Government to purchase the land for the left bank, and the anticipated gift of approximately five acres on the right bank. The men inspected the two tracts, and then entered into negotiations for the left-bank tract. The Government had appraised the land at $200.00 and the parties agreed, after some haggling, on a price of $230.00. Then the discussion turned to the donation of the right-bank land. The Corps representative first requested Mr. Kruger to draft a letter "to whom it may concern" stating that the company would grant permission to construct a dike on its land, with the one condition that the operation of three water wells would not be hindered. Kruger was agreeable to these terms, but requested that the Government draw up

the letter since it "knew what it wanted". Cottrell had the Corps legal staff prepare two documents, an "Offer To Sell Real Property" covering the land for the left-bank operation, and a letter addressed "To Whom it May Concern", granting a right-of-entry for right-bank construction. The former was a standard printed form, titled "Department of the Army", with only the legal description of the property, the time period of the offer (90 days), the sum agreed upon, the date, and plaintiff's name typed in. Paragraph 11 of this form reads as follows:

(11) All terms and conditions with respect to this offer are expressly contained herein and the Vendor agrees that no representative or agent of the United States has made any representation or promise with respect to this offer not expressly contained herein.

The "To Whom it May Concern" letter was entirely typewritten, without other title, and read:

June 28, 1962

To Whom it May Concern:

The undersigned, in consideration of mutual protection and convenience of the parties, hereby grants the permit and license to enter upon the lands hereinafter described for the purpose of construction of a levee and flood protection system on the right bank of the Papillion Creek. Subject, however, to the following terms and conditions:

It is agreed and understood by all parties that as part of the consideration for this permit and right-of-entry, that the levee and flood protection system will be constructed in such a manner as to protect the existing wells and pumps of the undersigned from any damage or harm, whatsoever, and that no action will be taken to disturb the continued flow of water from all wells and pumps and throughout the period of this permit or right-of-entry.

The land affected by this permit or right-of-entry is located in Sarpy County, Nebraska and described as follows:

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

NATIONAL BY-PRODUCTS, INC.
By (SGD.) R. S. Fleming
President
Official Title

Cottrell delivered three copies of the "To Whom it May Concern" letter and seven copies of the "Offer To Sell" to the plant the next day. These were forwarded to National By-Products' home office, signed there, and returned to the Government on July 2, 1962. Cottrell's report to his own office indicates that he considered the two matters—left-bank and right-bank levees—as entirely distinct; the report does not say what he may have told the plaintiff's representatives as to the details of the proposed right-bank construction; it closed with the remark "Negotiations were completed with the receipt of the executed forms."

Because of the protracted negotiations with the CB&Q and the Air Force, see Part I, supra, the period of this offer slipped by, and on October 11, 1962, the Government requested and received an extension of the offer until December 31, 1962. On October 26th the Government accepted the "Offer To Sell", and three days later made a demand for immediate occupancy (as provided in the contract).

This was granted by return mail. A warranty deed was supplied by the Government and executed by the plaintiff on February 11, 1963.

The next contact with the Engineers Corps appears to have been a meeting in early 1963 at the National By-Products plant between Cottrell and Kruger discussing the situation. Whether the meeting was called at the request of Kruger or on the initiative of Cottrell is not recalled by either man. At this time Cottrell told Kruger that a regulation made it impossible for the expenditure of government funds directly on the right bank, but that the Burlington Railroad was being "overpaid" in an amount sufficient to build the dike on its side. There is no indication in the record of any further meetings or exchanges between the Government and plaintiff's officials prior to the postdiluvian gathering at plaintiff's plant in August 1964 which began the negotiations leading to the construction of the current right-bank levee.

We have no doubt that plaintiff's diligent counsel has produced all the evidence with any real bearing, but the inescapable fact is that what we have recited forms all the material from which we have to construct our replica of the transaction.

*The documents:*—The "Offer To Sell" and the "To Whom it May Concern" letter, supra, do not by themselves establish a contractual undertaking by the Government to build a levee to protect plaintiff's plant. The "Offer To Sell", read alone, is perfectly clear and unambiguous, and its obligations are certain. It deals solely with the land relating to the left-bank construction. Plaintiff does not attack it, but argues that the "To Whom it May Concern" letter is by itself a contract to build a right-bank levee, or, construed

together with the "Offer To Sell", forms such an agreement.

Read objectively, the letter is not a contract to build a levee. It does not name or indicate any other party, but bears the very general salutation of "To Whom it May Concern".[8] Plaintiff's witnesses testified they felt this was for defendant's benefit—the letter could then be used by any contractor the Government chose. This curious explanation (a letter to the Government could obviously be used by any government contractor) does not, in any event, remedy the lack of affirmative evidence of a contract; at most it neutralizes what would otherwise be evidence of the absence of such a contract and tends to justify plaintiff's subjective construction of the document.

But in any case there is no expression of undertaking or commitment in the letter. By-Products points to the phrases "for the purpose of construction of a levee and flood protection system on the right bank of the Papillion Creek" and "the levee and flood protection system will be constructed". In context the former words serve only as a limitation upon uses for which persons would be permitted to enter plaintiff's property and the latter form part of a sentence protecting the company's water wells in the event of such entrance. Further, there are no other terms normally needed for a construction contract—no time period, no specifications as to form and height, no indication of the methods or procedures to be followed.[9] We doubt that plaintiff's officers, as good businessmen, would ever enter into an indefinite contract of this type with more direct relation to their rendering business.

Nor do we find that these deficiencies in the "To Whom it May Concern" letter

8. While the December 27, 1961, letter, supra, is wholly typewritten (as was the "To Whom it May Concern" letter) it was addressed directly to the District Engineer, and referred to the Government as the party to do the levee repair.

9. In proper circumstances some of these deficiencies could be remedied by implying "reasonable" terms and would therefore not affect the validity of the whole contract. However, the lack of any terms which would ordinarily be present in such a contract is persuasive that this was not a contract to construct a levee or to assure that one would be built.

are cured by the existence of the "Offer To Sell". The latter is limited to an offer to sell one piece of property, and in no way relates to any construction program anywhere. The former does not specifically or impliedly relate to the latter. The documents have different titles, were negotiated separately—though discussed at the same meeting, the "Offer To Sell" terms were determined first, then the terms of the donation—were in a different form, and were given to plaintiff in a different number of copies. Further, the "Offer To Sell" contained a disclaimer, in paragraph 11, of any additional representations or promises. We need not decide whether such language standing alone would require that the documents be read separately; it is at least evidence that they were not intended to be read together.

The plaintiff urges us to apply the rule that agreements contemporaneously made should be construed together. Even under that maximum, the most that is supplied to the "To Whom it May Concern" letter is a second party (the United States) to the pact. The document is not transformed from a right-of-entry onto the company's land into a contract by the Government to build a levee or to cause one to be built; the undertaking or commitment absent in the letter is not supplied by the "Offer To Sell".

The plaintiff also says that, since the Government drafted both instruments, they should be interpreted against it. But this is not the typical situation for invoking that rule. Cottrell first suggested that the plaintiff's representatives draft the document showing its willingness to donate the land necessary for a right-bank levee. It was only at the company's request that Cottrell had a government attorney prepare the letter. This transaction had none of the overtones or the problems of the Government's thrusting lengthy, complicated documents, drawn up by the defendant alone, under

the nose of a private party with the admonition to "take it or leave it". On the contrary, this was more nearly an instance of mutual drafting in which neither party bears the brunt of uncertainties. See Deloro Smelting & Ref. Co., Ltd. v. United States, 317 F.2d 382, 386, 161 Ct.Cl. 489, 495 (1963); 3 Corbin on Contracts § 559 (1960); cf. Kaiser Aluminum & Chem. Corp. v. United States, 388 F.2d 317, 329, 181 Ct.Cl. 902, 923–924 (1967). The Government, which for the plaintiff's benefit took the job of drafting the simple instrument, should not be made to carry alone the burden of misunderstandings arising from it—especially since there is no indication of uneven bargaining power or overreaching, and the document was of a type common to private land transactions rather than unique to government practice.

*The negotiations:* The plaintiff does not strongly suggest that the documents by themselves will establish its claim. It really relies on the papers, together with alleged oral representations and the circumstances surrounding the negotiations, plus the later conduct of the defendant, to prove the informal contract.

The major contention is that during the June 20, 1962, negotiating session Cottrell of the Engineers actually told Kruger and Wasser of plaintiff's staff that the Government would build the right-bank levee, or see that it got built, as an inducement to them to convey the 3.73 acre tract on the left side. The record is contradictory. Plaintiff's personnel testified that Cottrell represented that the Government would build the right-bank levee, or at least that the Government would have its contractor build it.[10] Cottrell testified that he told Kruger and Wasser that the Government "could not construct the right bank," but that it was "morally inclined to think that it was necessary." He then "inquired about the possibility of their company granting someone the right to construct this right bank levee."[11] Cottrell

---

10. Transcript at 13, 15, 34 (Kruger); 50–51, 65 (Wasser).

11. Transcript at 123–24.

was aware of, although not involved in, the negotiations with the CB&Q,[12] and may have investigated the possibility of the participation of the defunct Eastern Sarpy County Drainage District;[13] therefore he knew of at least one of the possible bodies who could build the right-bank levee. However, he did not testify that he told plaintiff's officials that some other body would build it. Both Kruger and Wasser testified that their impression was that the United States would build it.[14]

Plaintiff's witnesses could not remember any of the words actually used by Cottrell at the June 20th meeting. Cottrell attempted to paraphrase his presentation, but his testimony was somewhat colored from hindsight. The most we can gather from the testimony is that Kruger and Wasser received the impression that the Government would build the levee, and that Cottrell had not the slightest intention of creating such an impression. From all the evidence we conclude that a true picture of what was actually said requires us to discount somewhat the testimony of all the witnesses.[15] It appears most likely that Cottrell did not say specifically that the Government was unable to construct a levee on the right bank; on the other hand, we do not believe that he said the Government would build one. We infer, rather, that he represented, or (in the words of plaintiff's counsel) "advised that"[16] a levee would be constructed on the right bank, without making any further clarification, either in the form of an undertaking on the part of the Government to build it, or of an explanation that someone else would have to do it.

We are led to this conclusion by several factors, in addition to the testimony we have just summarized. First, it was the consistent demand of the CB&Q that the defendant build a right-bank levee but the Corps had refused to make such a promise to the railroad; it is highly unlikely that it would make it to National By-Products. It is clear from the record that the major party, as far as the Government was concerned, was the railroad; plaintiff and Platt were minor characters. Right-bank protection was demanded as consideration by the CB&Q but was never, from the record, formally requested by plaintiff. We do not consider it probable that such a promise would be refused when demanded by the principal member of the other side, only to be given gratuitously to the one party which was most cooperative.

Cottrell also knew that Platt was going to cause trouble. Two days before the June 20 meeting with Kruger and Wasser he got his first rejection from Platt, and, the next day, his second.[17] Following these encounters it seems unlikely that Cottrell would unqualifiedly represent that any progress on a right-bank levee was in the offing. It is doubly unlikely that he represented that the Government was going to see that it was done.

Plaintiff emphasizes the consistent attitude of the Corps of Engineers that right-bank protection should be provided, and the repeated requests to the Air Force to change the real estate and design directives to make it possible for the Corps to build the right-bank levee and condemn the necessary land. We are impressed with the public-minded and conscientious approach of the Corps throughout this matter. However, we are equally impressed by its continued devotion to the principle that its author-

12. Transcript at 137.

13. Transcript at 138–39.

14. Transcript at 34, 65.

15. The trial commissioner made no findings on the credibility of the opposing testimony, nor did he resolve the conflict since he assumed, for the purposes of his discussion, that a contract was made, but ruled that it was subject to the condition precedent that Herman Platt agree to allow entry onto his right-bank property for construction of the levee provided in the informal agreement. This was not a point raised by the parties.

16. Transcript at 15.

17. Defendant's Exhibit No. 33.

ity was limited by the directives of the Air Force. While there were a great number of requests to allow the Corps to undertake right-bank work, there were just as many rejections of such authority. That the Corps continued to follow proper channels in this regard is convincing that it would not disregard the directives in this one instance.

Plaintiff also urges that the Government's dealings with the CB&Q in offering to pay, and actually paying into the court's registry when condemning the railroad property, an amount sufficient to build a right-bank levee, indicates defendant's assumption of the responsibility for the construction of that project (as well as an acknowledgement of its authority to do so). By-Products points, too, to the initiative taken by the Corps after the floods—to bring the various interests together and get a right-bank levee built—as a tacit admission of its obligation. Neither point persuades. The record shows that the Corps and the Air Force considered that the CB&Q had a legitimate contention that damages from a taking of an interest in its property for construction of a higher left-bank levee would include whatever expenses were necessary to protect its right-bank embankment from the potentially higher floods. The railroad's position might not prevail in the condemnation proceeding, being opposed, as the Government recognized,[18] by the argument that this constituted merely consequential damages (see Part III of this opinion) ; however, it is far from meritless. The CB&Q estimat-

ed that it would cost $85,000 to raise its embankment to a height sufficient to allow floodwaters to flow underneath it, and that there would be future damage claims to farm lands lying to the south and east for flooding caused by waters flowing under the higher embankment. The Government reasonably considered the payment of $15,000 or $16,000, the cost of building a right-bank levee which would achieve the same protection for the CB&Q, as a proper settlement.[19] Likewise, we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem (or perhaps to fear of tort suits), and not to any feeling of *contractual* liability.

On the other hand, plaintiff's later activity does cast doubt on the staunchness of its belief in the Government's contractual obligation. By-Products learned definitely in December 1962 that the defendant was not going to build the levee, but the company continued to think it would be erected as soon as technicalities were worked out. Early in 1963 the Corps' representative told plaintiff specifically that the Government's funds could not be directly used but that the CB&Q was being "overpaid" in a sum sufficient to build the right-bank dike. At this time, plaintiff must have surmised that there was grave doubt that the Government recognized any obligation,[20] but the company gave the United States a warranty deed to the left-bank property in February 1963, and the record contains no demand by the plaintiff

---

18. Defendant's Exhibit No. 19, Colonel Palmer felt, however, that a "difficult question of law" was involved.

19. 33 U.S.C. § 596 (1964) reads in pertinent part:
   "It is declared to be the policy of Congress that owners * * * whose property is acquired for public works projects of the United States of America shall be paid a just and reasonable consideration therefor. In order to facilitate the acquisition of land and interests therein by negotiation with property owners, to avoid litigation and to relieve congestion in the courts, the Secretary of the Army * * * is authorized in any negotiation for the

purchase of such property to pay a purchase price which will take into consideration the policy set forth in this section."
   Although this section applies specifically to public works projects and this was a military project, the spirit of the section, and perhaps its letter, is applicable to the acquisition of land for this purpose so closely related to public works projects.

20. In fact, plaintiff's treasurer (at its home office in Omaha) kept asking Mr. Kruger (at the plant) what was happening and why the company wasn't getting anything.

upon the Corps at any time before the disastrous floods in May and June 1964.

These are the grounds on which we conclude that, at the time of the "To Whom it May Concern" letter and the surrounding negotiations, the Government in fact made no more than a representation that in its then view the right-bank dike would eventually come into being. Such a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built. Rather the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur.[21]

The same set of factors, however, impel us to find that the two contrary understandings of the "deal" were both objectively reasonable in the totality of the circumstances. It was not unreasonable for the company to conclude that the United States had agreed to build the right-bank levee or see that it was erected. It was not unreasonable for the Government to think that it had merely revealed its belief that someone would construct the dike. The former would lean, in its thinking, on its general impression rather than precise words; the latter would stress, in its own mind, the exact language uttered or included in the documents.

*Relative responsibility:*—Thus far, we have concluded that neither the documents themselves, nor the oral representations and other circumstances, nor the later actions of the parties, demonstrate

more than that plaintiff and defendant took opposite, but reasonable, views as to the nature of the obligation represented by the "To Whom it May Concern" letter. Plaintiff is therefore not entitled to recover unless the Government knew or had a basis for knowing the other view held by By-Products, or for some other reason had the burden of clarifying the transaction (see WPC Enterprises, Inc. v. United States, supra, 323 F.2d 874, 163 Ct.Cl. 1).

In none of the evidence already mentioned can we find proof of the Government's actual knowledge of plaintiff's belief. The claimant points to one additional Corps document. The memorandum of a meeting held June 27, 1962 (after the negotiations with plaintiff) at which Cottrell was present, set forth this understanding of the Corps as of that date:

> Construction plans call for right bank dike construction, on an informal basis, for the protection of the Chicago, Burlington and Quincy Railroad right-of-way, the National By-Products, Inc., rendering plant, and a five acre tract owned by Mr. Platt. Without right bank dike construction, the cooperation of the C.B.&Q. Railroad and the National By-Products, Inc., will be lost and the possibility of future damage claims by these owners, arises.

From this plaintiff draws knowledge by the Corps of the Government's contractual liability to the plaintiff, or at least its knowledge of the plaintiff's view. To us, the more likely interpretation is that

---

**21.** Holdings in this area result from factual considerations in each case, and none can serve as authoritative precedents in the traditional sense. For a recognition of the general principle, see Cabaud v. Federal Ins. Co., 37 F.2d 23 (C.A. 2 1930); Peters v. Bower, 63 So.2d 629 (Fla.1953); Harper v. Kennedy, 15 Ill. 2d 46, 153 N.E.2d 801, 805 (1958); Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 45 N.E.2d 473 (1942); Anderson v. Backlund, 159 Minn. 423, 199 N.W. 90 (1924); Broad Street Nat'l Bank of Trenton v. Collier, 112 N.J.L. 41, 169 A. 552 (Sup.Ct.1933), aff'd, 113 N.J.L. 303, 174 A. 900 (Ct.Err. & App.1934); Esslinger's, Inc. v. Alachnowicz, 68 N.J.Super. 339, 172 A.2d 433 (Super.Ct.App.Div.1961); 1 Corbin on Contracts § 15 (1963). But see Barcroft Woods, Inc. v. Francis, 201 Va. 405, 111 S.E.2d 512 (1959) (written clause assuring that third party would build lake and beach fronting property, with additional compensation paid therefor, demand made for performance and performance assured by defendant).

the Government feared the same sort of opposition from the plaintiff as it had received from the CB&Q if the plans for right-bank construction fell through. Plaintiff at this time had expressed an intention to sign an offer to sell its land needed for the left-bank project. The actual "Offer To Sell" was not yet in the hands of the Corps; being merely an offer and not an option, it was revocable at any time. We think that the Corps then felt that, when plaintiff discovered that the right-bank plans were not proceeding according to schedule, it would withdraw its offer and take a position like that of the CB&Q. (In fact plaintiff did discover some of the complications, when it was asked to intercede with the recalcitrant Mr. Platt.) The memorandum's reference to "future damage claims" cannot have meant a claim for breach of contract since, admittedly, the CB&Q did not have a contract right to construction of the right-bank levee, and plaintiff and the railroad are lumped together in the sentence; the reference must have been to tort claims (or possibly suits for just compensation). In short, the government memoranda are candid, and they reveal no inkling of actual knowledge of the plaintiff's interpretation of the agreement.[22]

Did the Government have "reason to know" of the plaintiff's view, or in the Restatement's words, did it have "information from which a person of ordinary intelligence would infer that the fact in question does or will exist", or is the inference that "there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence"?[23] The most that the Corps knew or could be expected to know was that a person in plaintiff's position would be interested in protecting himself from the greater chance of floodwaters caused by left-bank construction. The defendant's agents could reasonably assume, however, that National By-Products inquired on its own and was satisfied with the CB&Q compromise arrangement—after all the plaintiff could easily consult, and be expected to consult, with its neighbor, the railroad, which was in the same danger— and that it would continue to look after its own interests. Or the Government could well assume that plaintiff was otherwise satisfied with the probability that the dike would be built. On the basis of the then situation and plaintiff's actions, the Corps would not be required to assume that plaintiff contemplated that the Government would build a right-bank levee, or guarantee that one would be built. After all, this was a rather commonplace, several-cornered real estate transaction in which the Government was trying to put a "deal" together. In ordinary land transactions the parties act to protect their own interests, and there is no reason to think that they will act differently when the Government is a party. Nor is there reason in an instance like this for requiring the Government to act differently from any other party, with a greater obligation to disabuse other participants of their unknown misapprehensions. The case is therefore quite different from WPC Enterprises, Inc. v. United States, supra, 323 F.2d at

22. Another contention is that the $230 agreed upon at the June 20th meeting for the left-bank tract was not adequate compensation for 3.73 acres. If this were so, perhaps the Government would have had reason to know that plaintiff felt there was additional consideration involved. However, there is little in the record to substantiate plaintiff's argument. The appraised value of plaintiff's land was $200 (Plaintiff's Exhibit No. 39); there was dickering as to the final amount; the CB&Q considered that the value of the interest in its 11 acres needed for the project (without regard to the severance damages) was $100. (Plaintiff's Exhibit No. 45.) That Herman Platt felt his land was worth $290 per acre is not persuasive, in light of his general credibility as a witness. Further, it is inconceivable that plaintiff's land was worth $12,230, which would include the contemplated levee cost.

23. Restatement (second) of Contracts § 21, comment b (Tent.Draft No. 1, 1964).

877–880, 163 Ct.Cl. at 7–12, in which we held that the Government, which bore the initial burden of ambiguity in defective specifications, did not escape that burden when negotiations to clarify the defect resulted in continued ambiguity and difference of interpretation. Here, there was no root fault on the part of the Government from which the later misunderstanding flowered.

The truth is, we suppose, that, here as in so many dealings, both parties talked in too-vague generalities and refrained from putting the precise, pointed queries which would have exposed the unresolved ambiguity. Each may have been reluctant to ask the exact question or to detail meticulously his own understanding for fear that precision would be detrimental to his interest or would destroy the whole transaction. In any event, their words flew across the room without ever colliding. Both were responsible for the failure to clarify, but even so we are inclined to see the plaintiff as the party with the greater responsibility since it was seeking to pin a contractual obligation on another. The company's understanding is not flatly contradicted by the documents, but neither is it at all spelled out in those writings. It would be natural to tie down through explicit inquiry that those unclear papers embodied the large-scale undertaking plaintiff envisaged. As time went on, there were other points at which further inquiry would have been natural. For instance, after the dealings with Herman Platt (which took place well before the "Offer To Sell" was accepted) plaintiff could have asked the Corps of Engineers about the true arrangements for the construction of the right-bank levee. The Government did not show any willingness to condemn Platt's land, which it otherwise would have done, but told plaintiff that the "entire project, for both banks" depended upon Platt's cooperation. This was certainly one signal, and there were others (as we have detailed above).

For these reasons we hold that plaintiff has not established that there was any contractual obligation on the part of the Government to build, or have built, a right-bank levee for the company's protection.[24]

## III.

The alternative claim is that the United States has taken a flowage easement over plaintiff's property by building a levee to protect the federal land without providing similar security for plaintiff's right-bank property when the Government knew that the new left-bank dike would increase the likelihood of right-bank flooding. We adopt the trial commissioner's findings that if the new left-bank levee had not been built plaintiff's property would not have been flooded, at least by the May 1964 flood, and that defendant's engineers contemplated that a natural consequence of the construction of the left-bank levee would be a greater chance that plaintiff's property would be flooded when the creek reached a certain stage. Nevertheless, we hold that defendant has not taken any interest in plaintiff's land requiring compensation under the Fifth Amendment.

⬛ The Supreme Court and this court have recognized that the United States

---

24. Plaintiff contends that the Government is estopped to deny the existence of a contract because it has accepted benefits. This argument is based on the erroneous postulate that whenever a person benefits it is necessarily the result of some contract. Moreover, defendant's only benefit here arose from the "Offer To Sell", the terms of which are not in dispute and which, as we have decided, was not linked to any undertaking to build a right-bank dike.

Because of our conclusion that there was no contract to build a right-bank levee, we do not reach defendant's argument that its agents had no authority to enter into such a contract, nor plaintiff's reply that the government is estopped to make such a denial. As indicated above, we do rely on consistent recognition by the Corps of its limited authority as evidence that it did not exceed those recognized limits in this instance.

can appropriate land to its own use as effectively by flooding it as by occupying it in other ways. Pumpelly v. Green Bay & Mississippi Canal Co., 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872) (applying Wisconsin constitutional provision similar to Fifth Amendment); United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903); United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L. Ed. 787 (1910); United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933); Cotton Land Co. v. United States, 75 F. Supp. 232, 109 Ct.Cl. 816 (1948). It is equally settled, however, that not all floodings caused by or partially attributable to governmental activities amount to a taking. Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363 (1913); Hughes v. United States, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374 (1913); Cubbins v. Mississippi River Comm., 241 U.S. 351, 36 S.Ct. 671, 60 L. Ed. 1041 (1916); Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L. Ed. 608 (1924); United States v. Sponenbarger, 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939); Matthews v. United States, 87 Ct.Cl. 662 (1938); Kirch v. United States, 91 Ct.Cl. 196 (1940); North Counties Hydroelectric Co. v. United States, 70 F.Supp. 900, 108 Ct.Cl. 470 (1947); North Counties Hydro-Electric Co. v. United States, 151 F.Supp. 322, 138 Ct.Cl. 380, cert. denied, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957); B Amusement Co. v. United States, 180 F.Supp. 386, 148 Ct.Cl. 337 (1960) (Congressional reference case); North Counties Hydro-Electric Co. v. United States, 170 Ct.Cl. 241 (1965) (Congressional reference case).

■ The Government has been held liable where the construction of a dam or other obstruction in a stream results in either permanent flooding (Pumpelly v. Green Bay Co., supra; United States v. Welch, supra; Cotton Land Co. v. United States, supra), or "a permanent liability to intermittent but inevitably recurring overflows" (United States v. Cress, supra, 243 U.S. at 328, 37 S.Ct. at 385). But the courts have held that one, two or three floodings by themselves do not constitute a taking. The plaintiff must establish that flooding will "inevitably recur", in the phrasing of the Cress case. See the three North Counties Hydro-Electric Co. cases, supra; B Amusement Co. v. United States, supra; Goodman v. United States, 113 F.2d 914, 918 (C.A. 8 1940).

■■ The distinction between "permanent liability to intermittent but inevitably recurring overflows", and occasional floods induced by governmental projects, which we have held not to be takings, is, of course, not a clear and definite guideline. This is understandable, since the rule is really an application to this particular situation of the general principle that the Government is not liable under the Fifth Amendment for "consequential damages" arising from the carrying on of its lawful activities. See, e. g., Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336 (1879); Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996 (1897); United States v. General Motors Corp., 323 U.S. 373, 65 S. Ct. 357, 89 L.Ed. 311 (1945). This "consequential damages" principle is necessarily a somewhat flabby standard which has taken on meaning only through developing case law. See the discussion in Cotton Land Co. v. United States, supra, 75 F.Supp. at 233–235, 109 Ct.Cl. at 828–832; 4 Nichols on Eminent Domain § 14.-1, at 476 (rev. 3d ed. 1962). Some of the cases on flooding expressly apply the "consequential damages" test. See, e. g., Jackson v. United States, supra, 230 U.S. at 23, 33 S.Ct. 1011; Sanguinetti v. United States, supra, 264 U.S. at 150, 44 S.Ct. 264; Danforth v. United States, 308 U.S. 271, 286–287, 60 S.Ct. 231, 84 L.Ed. 240 (1939); Matthews v. United States, supra, 87 Ct.Cl. at 720–724; B Amusement Co. v. United States, supra, 180 F.Supp. at 389, 148 Ct.Cl. at 341. The essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to

the magnitude of an appropriation of some interest in his property permanently to the use of the Government.[25]

In this instance plaintiff has failed to establish that the floodings which occurred in May and June of 1964 will inevitably recur. Those floods were the result of a particular "concatenation of physical conditions", North Counties Hydro-Electric Co. v. United States, supra, 170 Ct.Cl. at 248, which plaintiff has not shown will continue to occur. The basic fact is that the Papillion Creek has always been subject to flooding. Plaintiff's levee was sufficient to withstand a flood of 10,500 c. f. s. if it were not breached at a lower level. Floods of greater height occurred quite frequently but plaintiff has largely been spared major flooding in the past because other dirt levees had breached at sufficiently low levels to relieve the pressure on By-Products' levee. There is no showing that this would not be the general rule in the future.

Moreover, the floods of 1964 were severe by Papillion Creek standards. There is no proof that such rainfall and resulting floodwaters will recur inevitably in the future. Another factor in 1964 was that the downstream portion of the creek was unusually constricted with debris and silt at the time of those floodings, creating greater pressure on plaintiff's levee. Again, there is no reason to believe that these conditions will remain. In fact, substantial channel straightening and debris removal was undertaken in 1964. Also, the flooding of plaintiff's property was partially due to the weakness of its own levee, a condition which would not necessarily continue into the future. Actually, the new levee constructed by Sarpy County, with the cooperation of the plaintiff and its neighbors, now insures that such flooding will not inevitably recur.

Plaintiff urges that the Government's foreknowledge of the consequences of building its left-bank levee requires a contrary result, relying upon Jacobs v. United States, supra, 290 U.S. at 16, 54 S.Ct. at 27. There the Supreme Court was presented only with the question of the propriety of awarding interest as part of the damages for a taking. In passing, however, the Court said:

The Government contemplated the flowage of the lands, that damage would result therefrom, and that compensation would be payable. A servitude was created by reason of inter-

---

25. The Government relies upon decisions involving federal levee and dam construction projects on navigable streams, designed to increase their navigability and provide flood protection. In Jackson v. United States, supra, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Hughes v. United States, supra, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374; Cubbins v. Mississippi River Comm., supra, 241 U.S. 351, 36 S. Ct. 671, 60 L.Ed. 1041; United States v. Sponenbarger, supra, 308 U.S. 256, 60 S. Ct. 225, 84 L.Ed. 230, and Kirch v. United States, supra, 91 Ct.Cl. 196, landowners made claims similar to those here— that the projects raised the general level of water in the Mississippi River, subjecting their lands to greater floods, amounting to a taking without just compensation. The Supreme Court and this court ruled that there was no taking, relying, in substantial part, on the rule that each riparian owner on a navigable stream has the right to protect his own lands from floodwaters, and that no owner has a duty to provide concurrent protection to the property of his neighbor. However, Papillion Creek, by stipulation, is a nonnavigable stream, and the law of Nebraska appears to be the exact opposite of the Supreme Court's formulation ("A riparian owner * * * may not dam or dike against floodwaters to the injury of adjacent owners of land", Wiese v. Klassen, 177 Neb. 496, 129 N.W.2d 527, 530 (1964); see also Hofeldt v. Elkhorn Valley Drainage Dist., 115 Neb. 539, 213 N. W. 832, 53 A.L.R. 1174 (1927)). Because of these differences, we put the cited cases aside, without deciding whether the differences are significant.

Before the trial commissioner plaintiff appears to have argued that the Government's liability for a taking should be governed solely by Nebraska law. This contention was not briefed or argued before the court and we do not consider it.

mittent overflows which impaired the use of the lands for agricultural purposes. * * * There was thus a partial taking of the lands for which the Government was bound to make just compensation under the Fifth Amendment.

The opinion of the lower court, 45 F.2d 34 (C.A. 5 1930), reveals that the construction of a dam downstream from plaintiff's property caused him to suffer overflows in addition to and greater than any to which he was historically vulnerable, that they occurred only in the winter and early spring months, and that they prevented plaintiff's use of his lands for short periods only. We do not read the Supreme Court's short statement as establishing foreseeability of damage as a new criterion for a taking, nor as removing the requirement of proof that the intermittent overflows will inevitably recur. The latter requirement was met in the *Jacobs* case by careful government surveys establishing that the plaintiff's land would be subject to predictable overflows more frequently than before the dam was built. Jacobs v. United States, supra, 45 F.2d at 36.[26] It is a long settled principle that a taking is not affected by the extent of the benefit to the Government, but solely by the amount of injury to the landowner, Pumpelly v. Green Bay Mississippi Canal Co., supra, 80 U.S. (13 Wall.) 166, 20 L.Ed. 557. Similarly, the Government's foreknowledge will not convert an otherwise insufficient injury into a taking. At most it could strengthen the plaintiff's case in a tort action.

We conclude that plaintiff has not shown that the damage to its land rises above a temporary, incidental injury—in the nature of a tort, if anything—and therefore we find that there has been no

taking of its property requiring just compensation.

On neither of its grounds is the plaintiff entitled to recover. Its petition must be dismissed.

---

26. In a case arising from the proposed construction of a portion of a Mississippi River flood control project, Mr. Justice Brandeis said that, even assuming that "a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it", plaintiff was not entitled to an injunction because he had an adequate remedy at law. Hurley v. Kincaid, 285 U.S. 95, 103, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932). This *arguendo* statement falls far short of an authoritative departure from the requirements of the *Cress* case, supra, 243 U.S. at 328, 37 S. Ct. 380.