68 N.J. Super. 339 (1961)
172 A.2d 433
ESSLINGER'S, INC., PLAINTIFF-APPELLANT,
v.
MICHAEL ALACHNOWICZ, INDIVIDUALLY AND TRADING AS WILLIAMSTOWN BOTTLING WORKS, DEFENDANT-COUNTERCLAIMANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 19, 1961.
Decided July 12, 1961.
*340 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Frank E. Vittori argued the cause for the appellant (Mr. John H. Reiners, Jr., attorney).
Mr. Howard G. Kulp, Jr. argued the cause for the respondent (Messrs. Brown, Connery, Kulp & Wille, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
In April 1959 Esslinger's Inc., a brewer of beer, sued Michael Alachnowicz, one of its former distributors, for $4,509.84 on a book account. Alachnowicz filed a counterclaim for damages for termination of his distributorship, but in it he made no claim of the lifetime contract hereafter mentioned. On July 10, 1959 Esslinger's was granted summary judgment for the $4,509.84 plus interest, which Alachnowicz paid. It was not until September 1959 that Alachnowicz moved to amend the *341 counterclaim to set up said lifetime contract. After the amendment was allowed the case proceeded to a pretrial order, unfortunately almost completely devoid of the factual contentions of the parties, and then to a trial in the Superior Court, Law Division, which resulted in a judgment in Alachnowicz's favor of $48,000. Esslinger's appeals.
Esslinger's contends that its motions to dismiss the counterclaim at the end of the counterclaimant's case and at the end of the whole case should have been granted.
Whether there was a lifetime contract depends entirely upon the evidence of what was said in a single conversation which allegedly took place in March 1949 between Michael Alachnowicz, his son Stanley, and J.R. Brown, an officer of Esslinger's. Michael did not testify, allegedly because he was 72 years old and ill. Stanley was the only one who gave evidence on the subject on behalf of the counterclaimant. He testified (emphasis ours):
"Q. Stanley, after you learned, as you have already described, that Laurel Beverage had been cut off as distributors by Esslinger's, then you went in to see Mr. J.R. Brown, did you not?
A. Yes, sir.
Q. Tell us in your own words what you said to him at the time, and what he said to you or to you or your father?
A. We went in and we seen Mr. Brown. We told him * * *
By the Court:
Q. You said, `Mr. Brown,' you mean J.R.?
A. Yes. We said, `We come to see you about the Laurel Beverage again.' Seeing whether we could possibly service them, because they are very annoyed that they were told to buy off of South Jersey. I mentioned, `What is the reason you cut off Laurel Beverage's supply?'
He said, `Laurel Beverage is just interested in selling other brands.'
I said, `We are not. We are only interested in selling Esslinger's.'
By Mr. Kulp:
Q. By other brands, do you mean competitive brands?
A. Yes. I said, `We have nothing else but Esslinger's. Can we service these accounts because at the present time we are in these accounts with Red Cap Ale. We know everyone of them and they are very annoyed.'
He said, `Yes, I am getting a little bit of word back that they are very annoyed, and I have probably made a mistake. I had no *342 alternative but to make the move, because they are pushing other brands.' And I said, `Can we service them?'
He said, `Yes. Go out and straighten out the trouble.'
I said, `Yes. What kind of agreement are you going to give us in writing?'
And he said, `I am not going to give you no written agreement.'
I said, `Mr. Brown, you remember it's only about six or seven months ago that you took away the Fornataro accounts, and you told us after we straightened out the trouble they would be our accounts. You went back on your word once. What assurance do we have that you won't go back on your word again two or three years from now after we straighten out the trouble?'
He says, `I want you to go in and straighten out this trouble.'
I said, `We want some written agreement.'
He said, `I am not giving you a written agreement, it's against the policy of the company. I promise you I will never cut you off.'
Then my Dad says, `How about my son?'
He says, `Say, my son is active in the business. I am not going to live forever.'
He says, `Just go out and do a good job. I am not going to promise them to you in writing, so just go out and do a good job. As long as you go out and do a good job, I promise you I will never cut you off, and the same thing for your son.'
I said, `We are willing to take them, but we are going to have to put on new equipment and new men. Under those conditions you will never take them away from us, as long as we do a good job?'"
On cross-examination he testified:
"Q. Then will you quote again what was said back in 1949 in March that you previously referred to.
A. Well, in March, '49, Esslinger took the beer away from the Laurel Beverage Supply, and we heard about it, and the circumstances led up to that most of the customers didn't want to buy the beer off of South Jersey Beverage.
So we went in to see Mr. Brown, he is the vice president of the brewery, and we said, `We understand that you took the beer * * *'
Q. Who said?
A. I said, I am sorry.
I said, `I understand that you took the beer away from Laurel Beverage.'
And I said, `There is quite a few accounts that are very annoyed of the fact that you told them that they had to buy from South Jersey.'
And he said, `Well, I had to discontinue them because they were interested in selling Ortliebs.'
*343 I says, `Well, Mr. Brown, we are not interested in selling Ortliebs. We have Esslinger's to sell. Could we possibly take care of all these accounts because they are not too pleased in buying off of South Jersey?'
So he says, `Yes, you can have the accounts.'
He said, more or less, `I realize I made a mistake in trying to get the persons to buy off of one distributor. The only thing I am interested in is straightening the matter out.'
So I said, `Could we have any kind of an agreement in writing that you won't take these accounts away from us later on?
And he says, `No,' he said, `I won't give you anything in writing.'
I said, `Mr. Brown,' I said, `we don't want them because you remember that you took the Fornataro accounts last year off of us after you telling us that we could have them; after we went to the trouble and expense, you took those away.'
And I says, `Under those conditions if we can't get a written agreement, we do not want them.'
And he says, `Well, just go out and take care of these customers and get them,' and he says, `I promise you I will never cut you off.'
And my father says, `Well, that is fine.'
He says, `Well, how about my son?' He said, `Just so you go out and do a good job and you take on these customers,' he said, `you both have nothing to worry about.'
Q. Mr. Alachnowicz, this conversation that you referred to took place about 11 years ago; is that right?
A. 1949.
Q. Approximately 11 years?
A. Yes, sir.
Q. And how old were you at the time?
A. I was 23 years old.
Q. And you have attempted to tell us as best you can word for word what you said; isn't that correct?
A. Yes * * *"
The counterclaimant presented his case and recovered judgment not on the basis of the loss of only the Laurel accounts, but upon the basis of the loss of all of the profits of the beer sales that would have been made to all Alachnowicz's customers for the period of Michael's life expectancy.
In Broad St. National Bank of Trenton v. Collier, 112 N.J.L. 41, 44 (Sup. Ct. 1933), affirmed o.b. 113 N.J.L. 303 (E. & A. 1934), the court said:
*344 "A declaration of intention to act in a certain way, which does not show that the party who makes such declaration promises to act in such way, or intends to incur a legal liability obliging him to act in such way, is not an offer which can be accepted so as to make a contract. If it is sought to make an offer which, on acceptance, can become a contract, the words or acts by which it is made must show intention to assume liability. I Supp. Page on Contracts, §§ 77, 79.
The offer and acceptance must have the characteristics of a binding bargain."
Esslinger's argues that what Brown is alleged to have said, if he said it, was no more than such a declaration of intention, and that it must have been obvious to Michael and Stanley that he was not offering, on behalf of Esslinger's, to incur any legal liability, much less one which was to bind the corporation for the lives of Michael and Stanley. Furthermore, argues Esslinger's, there was no proof of Brown's authority to enter into such a contract  certainly not the clear and explicit proof that is required to establish authority to bind a corporation to such an unusual agreement. Finally, says Esslinger's, in any event the alleged conversation does not spell out the contract alleged by the counterclaimant, but on the contrary is so vague and indefinite as to be unenforceable.
Of course, whether there was such an offer by Brown on behalf of the corporation (assuming he had the authority to make it) depends not upon what Brown intended to say or upon what Michael and Stanley believed he meant, but rather upon what meaning the words should have conveyed to a reasonable person cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances. Broad St. National Bank v. Collier, supra; 1 Williston on Contracts § 21 (3d ed. 1957); Ashley, "Mutual Assent In Contract," 3 Colum. L. Rev. 71 (1903). Cf. Savarese v. Pyrene Mfg. Co., 9 N.J. 595 (1952); Bird v. J.L. Prescott Co., 89 N.J.L. 591 (E. & A. 1916). But, as Dean Ashley said (3 Colum. L. Rev., at p. 72) "If, then, we are to find the equivalent of mutual assent in the *345 action of the parties, although contrary to the intent of one of them, this action must be of such a character as not only to justify the party relying thereon, in the reasonable belief that they indicate assent on the part of the actor, but the situation must involve a further element, namely, that the actor himself ought, as a reasonable man, to know that his actions or words will fairly indicate assent on his part." And, as Williston said in section 21, supra, at p. 44:
"* * * even though one requests certain action or services by another, no contract is created if the latter should reasonably understand from the circumstances that the party making the request has no intention to contract and is justified in assuming that no legally enforceable obligations are involved."
And, if the words were words of contract, whether they were too indefinite to create a legally enforceable lifetime contract depends also on the same factors, namely, the meaning of the words when construed in the light of the relationship of the parties and of all of the antecedent and surrounding circumstances.
What, then, were those circumstances?
Michael had been in the business of selling Esslinger's beer (and, prior to repeal, near beer), and other beverages including non-alcoholic drinks which he bottled himself, in the "Gloucester-Camden area and part of Burlington County" since 1927. There is no evidence that he had any contract, written or oral, with Esslinger's prior to the alleged conversation with Brown in 1949. In the counterclaim it was asserted that in 1933 Esslinger's had "represented" to Michael "it would make him its distributor of Esslinger's beer in Camden and Gloucester counties," but no such claim was made in the pretrial order or at the trial.
Stanley testified that in 1948 Esslinger's had stopped selling its beer to a distributor named Fornataro because the latter was "pushing" a competitor's beer. When he *346 and his father heard of it, they went to Brown and asked "if we can possibly take care of his accounts because we are servicing the area now * * *." Fornataro had had 16 or 17 Esslinger's "accounts." Stanley testified that Brown had answered "Well, go ahead and take care of them, because the only thing I am interested in is seeing that they are served," and that "we said, `thank you.' We left and went to work." His testimony continued:
"Q. The accounts of Fornataro, generally speaking, were located where?
A. They were located in the Camden area, and the upper part of Gloucester County.
Q. All right. Now, what was the next thing that happened with regard to these accounts?
A. About six months later, J.R. called us and he said he would like to see us in the brewery. So we went to the brewery, my father and I, and he said, `I want you to discontinue selling these accounts that you took from Ed Fornataro.'
I said, `We just were in here six months ago, and you said it would be all right.'
He said, `I just want you right up in the Camden area here, and the trouble will be more or less straightened out a bit. I just want to take them away from you and give them to South Jersey, and you can concentrate more in the middle part of Camden County, and the lower part.'
We argued with him, and he said that is what he wants to do and that is what he is going to do. So we had no alternative but to agree to it, and we left."
In March 1949 Michael and Stanley heard that Esslinger's had stopped selling its beer to Laurel Beverage Company, another distributor, which had 29 accounts. It was then that they went to Philadelphia, solicited Laurel's business, and had the alleged conversation on which the counterclaim rested.
We pause here to point out that the counterclaimant does not deny (a) Esslinger's right, if that right was not affected by the alleged 1949 conversation, to allocate territory and customers, and (b) that Stanley and his father came uninvited to Philadelphia to ask Esslinger's to give them the Fornataro and Laurel Beverage customers. Brown did not on *347 either occasion solicit them to take the customers, or even invite them to come to Philadelphia to talk about Fornataro or Laurel. In short, it was not to accommodate Esslinger's that they took over these accounts. Michael and Stanley wanted to add these customers to their existing business, obviously because they deemed it would fit in with their operation and be profitable to do so.
If Michael and Stanley are correct in their contentions, the alleged conversation with Brown in 1949 gave each of them a lifetime non-cancellable distributorship, not limited to the Laurel Beverage accounts they took over but extending to all of the customers they had accumulated since 1927 in Gloucester, Camden and Burlington counties; and no part of those customers could be taken from them.
Let us analyze the conversation.
Stanley admits that he asked Brown only for "any kind of an agreement in writing that you won't take these [the Laurel Beverage] accounts away from us later on." (Emphasis added) This was a request for far less than the lifetime all inclusive contract now claimed, yet Brown flatly and brusquely refused, saying "I am not going to give you no written agreement." When Stanley persisted in arguing for a written contract, Brown said none would be given because "it's against the policy of the company." Did that mean it was against the policy to give a written contract, or to give any contract? It seems to us that the reasonable interpretation is the latter, for, as we have said, Michael and Stanley never had a contract although they had distributed Esslinger's beer since 1927; and there is no evidence that any other distributor had obtained one, through Brown or otherwise.
When Brown refused to enter even the limited written agreement, did it not indicate to Michael and Stanley that he intended not to bind Esslinger's legally at all? Michael and Stanley could not reasonably have believed that Brown, after refusing the little that they asked be given them in *348 writing, then orally bound the company to the all-inclusive lifetime contract now claimed.
When it is asserted that a lifetime contract was made, the law requires proof clear enough to overcome the fact that men rarely enter into lifetime contracts; and when, as here, the contract is between businessmen, is as all-inclusive as claimed, and binds Esslinger's for the period of Michael's and Stanley's lives but is terminable by them at will, the proof must be clear indeed. Cf. Savarese v. Pyrene Mfg Co., supra. As Williston said of distributorship contracts (4 Williston on Contracts § 1027A, p. 2858, (Rev. ed. 1936)) "The business purpose served is one best adapted to the bilateral rather than to the unilateral type of contract since it presupposes extensive and long-continued future performance on both sides; the bargain is usually embodied in an elaborate, printed document signed by both parties * * *." In Krueger v. Schoenling Brewing Co., 82 Ohio App. 57, 79 N.E.2d 366, 368 (Ct. App. 1948), the court said:
"The terms of the agreement could not have been understood by either party as constituting a life time obligation on the company * * * `where a contract is equally subject to several interpretations, one of which presupposes rational action upon the part of all parties thereto and the other irrational action upon the part of one of the parties thereto, courts in seeking to determine the intention of the parties will assume that the parties entering into the contract were each exercising reason, and give to the contract such reasonable construction as it will bear.'"
Although the Savarese case, supra, involved an employment contract, the rationale of that opinion is pertinent here. The Supreme Court said (9 N.J., at pp. 601, 603):
"Deeming them to be at variance with general usage and sound policy, the court's have shown a marked reluctance to enforce contracts for life employment. In large part this stems from the realization that such contracts frequently are, in practical effect, unilateral undertakings by the employer to provide a job for so long as the employee wishes to continue in it but impose no corresponding obligation upon the latter. In this respect, the burden *349 of performance is unequal as the employer is bound to the terms of the contract whereas the employee is free to terminate it at will.
Agreements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long-range commitments and they must be clearly, specifically and definitely expressed. Only then is it grudgingly conceded that not all such contracts are `so vague and indefinite as to time as to be void and unenforceable because of uncertainty or indefiniteness.' 56 C.J.S., Master and Servant, § 6, p. 70; I Williston on Contracts, Sec. 39, p. 110; 135 A.L.R. 646, et seq.

* * * * * * * *
Because of the unusual nature of the agreement, the length and permanence of the obligation undertaken, the various unforeseeable events and conditions which may be encountered in such a journey in futuro and the unpredictable effects upon the parties, special precautions have been decreed essential both as to considerations and the terms of employment in construing and enforcing the compact. The responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself."
It is to be noted that nowhere in the conversation was lifetime mentioned, or any other expression of duration. The claim of a lifetime contract is drawn as a deduction from Brown's alleged assurance "I promise you I will never cut you off * * * do a good job * * * you both have nothing to worry about." This alleged conversation took place eleven years before Stanley testified, and it is significant that no action was started on the alleged contract until Esslinger's sued Michael on the book account. Even then the alleged lifetime contract was not mentioned in the original lengthy counterclaim. It was first mentioned in the amended counterclaim, filed more than a year after the alleged wrongful termination. However, laying this aside as merely going to the weight of the evidence, in context the words "I promise you I will never cut you off" (emphasis added) are not indicative of an offer to bind Esslinger's to legal liability for the promisees' lives, but rather words of Brown's friendly assurances and good intentions toward Michael and Stanley.
*350 In any event, in the absence of express words of duration for life or for a fixed period the law presumes (absent evidence in the language or the surrounding circumstances leading to a different result) that a contract such as this is terminable at will or within a reasonable time. Bushwick v. Decatur Motors, Inc. v. Ford Motor Co., 116 F.2d 675 (2 Cir., 1940); Dover Copper Mining Co. v. Doenges, 40 Ariz. 349, 12 P.2d 288, 292 (Sup. Ct. 1932). Williston said (1 Williston on Contracts § 38, p. 113 (3d ed. 1957)): "It is not often that a promise will properly be interpreted as calling for perpetual performance." The counterclaim was not presented on the theory that Brown's words constituted a contract not to terminate the distributorship until after a reasonable time had elapsed, or that the notice of termination was too abrupt (Cf. 4 Williston on Contracts § 1027A, pp. 2857-2864 (Rev. ed. 1936)) but on the sole basis that it was a non-cancellable lifetime contract. Applying the foregoing principles, we find that the evidence here was not sufficient to establish such a contract.
Finally, we find that even in respects other than time the contract alleged was too indefinite to be enforceable. Obviously, territory is an important factor in the beer business. The parties demonstrated that in their dealings prior to 1949 and since. The counterclaimant asserted that he was doing business in parts of three counties. It was to be expected that the counties would grow. Was Esslinger's to lose all rights to reshuffle its dealers in the three counties during the lives of Michael and Stanley? Or was Esslinger's permitted to switch geographical territory but forbidden to take away customers from the counterclaimant in those areas? In that case, which customers? Only those who bought from Alachnowicz in 1949 (including Laurel's accounts) or those who became customers later as well? It would seem inefficient and impractical to have more than one dealer serve Esslinger's customers in a given, geographical area, unless it were heavily populated. Or, does a distributor's doing "a good job" include cooperation *351 with Esslinger's and its other distributors in arranging the redistribution of territory and customers?
There is nothing in the alleged contract as to the effort to be expended by Michael and Stanley in holding on to old customers and in obtaining new ones in this highly competitive business; as to the minimum amount of business that Alachnowicz must do; how many men and how much equipment they should have for servicing beer customers; how much of Alachnowicz's operation could be devoted to the soft drink and other non-Esslinger's parts of the business, etc. In short, as Williston said, supra, none of the details of the "extensive and long-continued future performance on both sides" is spelled out.
For the foregoing reasons, we hold that Esslinger's motion for judgment at the end of the entire case should have been granted. It is therefore unnecessary to demonstrate why we deem the evidence was insufficient to prove Brown's authority to bind Esslinger's to the lifetime contract asserted.
The judgment is reversed, and judgment is entered in favor of Esslinger's on the counterclaim. No costs.