574 A.2d 1021

MICHAEL ANNUNZIATA, FOR HIMSELF AND ON BEHALF OF ALL SIMILARLY SITUATED PERSONS, PLAINTIFFS, v. HARRY MILLAR,[1] DEFENDANT.

Superior Court of New Jersey
Chancery Division Monmouth County

February 14, 1990.

---

[1]The correct name of the defendant is Harry C. Millar, II.

*Michael P. Laffey* for plaintiffs.

*Michael J. Wenning* for defendant (*Keith, Winters & Wenning,* attorneys).

McGANN, J.S.C.

This is a class action on behalf of owners whose pets were buried, for a consideration, on property set aside for that purpose by an animal hospital operated by defendant (and his father and grandfather before him). Plaintiffs seek a permanent injunction against removal of any of the pet remains or use of the property in question for purposes other than that of a "pet cemetery".[2] I determine that plaintiffs have failed to prove their entitlement to such relief.

The facts are as follows.

The parcel of land which the plaintiffs ask be designated a "pet cemetery" is an open space approximately 100' × 200' making up part of the backyard of the Millar Animal Hospital. The entire tract of land on which the hospital was situated consisted of some 5.8 acres in the Township of Ocean. From 1928 to 1963 the land was owned by the defendant's grandfather, Dr. Harry C. Millar. In 1930 he built the hospital and opened his veterinary practice together with his son, Joseph A.S. Millar. The building and lot on which the hospital is now situate continues to be used for the same purpose to the present day.

Harry C. Millar retired from the practice in or about 1955 leaving his son, Joseph A.S. Millar as the sole proprietor of the animal hospital practice. Harry C. Millar died in 1961. In October 1964 Harry C. Millar II joined his father, Joseph, in the practice and in 1980 became owner of the land as well as sole shareholder in J & H Millar, P.A. Dr. Joseph A.S. Millar died in 1982.

By 1984, because of advancing years and a heart attack in 1983, Harry C. Millar II decided to sell the practice. He did so, in 1986, and retired. In connection with the sale of the veteri-

---

[2]The subject matter of pet cemeteries has been regulated by statute since February 7, 1986. N.J.S.A. 4:22A–1 et seq. That law is inapplicable to this case.

nary practice, a 1.5 acre parcel which included the hospital building was subdivided from the original 5.8 acre piece and transferred to the new owners.[3] The "pet cemetery" is located on the remainder of 4.3 acres retained by defendant.

Harry C. Millar II's memories of the practice and of the handling of dead animals go back to his childhood and the early years of the Millar Animal Hospital. He and his father and mother resided in an apartment over the veterinary facilities. He recalls that the disposition of the remains of deceased pets has always been somewhat of a problem. Unless the owners requested otherwise the carcasses were buried in a common lime-pit in the 100' × 200' area or incinerated on the premises. Any ashes were simply put into a hole in the ground in that same area. After 1955 the hospital acquired a crematory oven and the Millars thereafter were able to offer pet owners the option of having the ashes of their pets returned to them.

Almost from the beginning, a few pet owners, particularly attached to their pets, wished the remains to be treated in a more formal fashion by burial in a specific spot in the 100' × 200' area. Some desired a simple coffin; some did not. Some wanted the burial spot marked; some did not. Beginning in the 1930s with Harry C. Millar, all of the Millars—grandfather, father and son—responded to such requests by offering, for a fairly nominal fee, the construction of a pine box of the requisite size, the digging of a grave, the burial, and the supplying of a wooden marker with identifying information on it. The owners were notified of the time of the interment; could be present if they wished and were free to visit the site thereafter whenever they desired. Income from this service was an insignificant part of the animal hospital total income.

---

[3]The fact that the new owners did not acquire the pet cemetery as well, is clear evidence that no "good will" was ascribed to it as an adjunct to the veterinary practice.

Many owners never returned. Some did and would place flowers and the like on the grave sites on the anniversary of the date of death or on various holidays. Because the wooden markers ultimately disappeared, a few owners asked for and received permission to erect permanent markers, similar to those in a cemetery for humans. Photographs in evidence show that these vary from rather substantial stone markers to more modest but nonetheless permanent ones, flush with the ground. The burials referenced by these permanent markers span the years from 1935 to 1981. The last pet burial was made in 1984. Thereafter, unwanted carcasses were removed by a commercial service.

Other than the initial casket and burial charge, the animal hospital charged no fee for maintenance or upkeep of the cemetery area. The man employed as the caretaker of the hospital property cut the grass plots in front and on the sides of the building as well as that in the back (including the 100' × 200' burial area). He was the grave digger as well.

Interested owners were allowed to plant flowers if they desired. One installed a metal garden bench so that when visiting the spot, there would be a place for restful contemplation of the happiness which the pet had brought into the owner's life.

Most of the pets buried were predominantly dogs or cats. However, as the defendant testified, the remains of horses, goats, snakes, pigs, rats, mice, chickens, geese, ducks and pigeons were, over the years, disposed of or buried at the request of their owners.

As may be imagined, space in a plot 100' × 200' could well have become a problem with the passage of time. It did not. The primary reason is that no individual plots were created or in any way delineated. An owner could select a desired spot where there was no permanent marker. The maintenance man would run a rod into the ground to see if it struck any solid remains. If it did, the owner had to pick an alternate location.

If it did not, the hole was dug and the pet interred. Graves varied in length from 2.5 to 4 feet depending on the size of the pet. (There were times that in digging the hole some trace remains of a former burial were uncovered. In such case, the hole was dug deeper than usual; the trace remains placed in the added depth and covered and the new burial made on top). Thus, with the passage of years unmarked areas could be reused.

The Millars never advertised the existence of the "pet cemetery" in any fashion. Other veterinarians became aware of its existence and sometimes when asked by their patients, mentioned it to them. Although primarily a service for their clients, the Millars did not refuse a request for a pet burial from non-clients and charged them the same fairly nominal fee. The fee varied with the size of the animal.

Against that background the class of plaintiffs in this action was narrowed to those owners whose pets' burial sites were permanently marked and identified. This litigation commenced after Dr. Millar sent a letter dated July 30, 1988 to all owners of buried pets whose names and addresses could be ascertained from records of the business. It reads as follows:

TO WHOM IT MAY CONCERN:

After approximately 56 years, we can no longer pay the ever-rising and exorbitant costs of insurance, machinery and other expenses incurred in the maintenance of the pet burial area at the rear of the former Millar Animal Hospital in Oakhurst, New Jersey.

As you are no doubt aware, no charge was made to the owners of the deceased pets for the above or any other maintenance costs.

Consistent with our longstanding cooperation, we are giving you an opportunity for a period of ninety (90) days from the above date, to remove your pets' remains and any markers and monuments, otherwise the same will be subject to such disposition as may hereafter be made by the then owner of the land involved.

Very truly yours,

Shortly after the filing of the complaint, a consent order was entered restraining the defendant from disinterring any pet remains or in any way disturbing the gravesites.

Nine pet owners testified at trial. In many ways, their situations were similar. During the lifetime of the pet or pets each owner had developed a deep affection for the animal or animals. In all but one instance the pet involved was a dog. The one exception was a cat. The testimony of the individual owners is summarized as follows.

Michael Annunziata is a life-long resident of the Asbury Park area. He had two dogs to which he was very attached. "Prince" died in 1980; "Pierre" in 1981. He was familiar with the Animal Hospital and the pet burial ground behind it. Although neither dog had been a regular patient of the Millars, he took them there for burial. He paid a charge of $200 for each dog for a pine box (they were larger size dogs), the digging of the grave, interment and wooden marker. The graves were side by side. He subsequently placed a large marble monument on the grave sites. The burial area attracted him because it had a peaceful, park-like setting. The headstones scattered around added a sense of permanence to the scene.

He inquired how long the space had been used for pet burials and was told that it had been there for some 50 years. Dr. Millar told him that the cemetery "wasn't going anywhere". Annunziata assumed that it would remain for that purpose "forever". Although there are a number of commercial pet cemeteries which advertise in the Yellow Pages (including one in neighboring Neptune Township) Annunziata chose to use the Millars' facilities. His understanding of the use of the word "forever" was that for as long as he lived he would be able to visit an identifiable gravesite of his pets.

Elizabeth Brown is also from Asbury Park. She has known of the existence of the pet burial ground for many years. Her dog died in December 1981. Although the animal had not been a patient of the hospital, Dr. Harry Millar, when asked, said it would be all right to bury the dog there. She did not select the grave site. She did provide a baby coffin in place of a pine box and had the dog embalmed by a local funeral home. (Millar

was not aware of the embalming.) She paid a charge of $250 and thereafter erected a permanent monument.

At the time of making the burial arrangements she inquired of Millar whether the cemetery would always be there. He replied, "Yes". Based on all she observed and was told, she believed that the dog would not be disinterred.

Cheryl Trabacco lived in Livingston, New Jersey. Her dog "Gigi" died in 1980. She asked her veterinarian in Summit whether there were any pet cemeteries available. He gave her the names of three including the Millar Animal Hospital and the commercially advertised cemetery in Neptune Township (Still-meadow Animal Rest Cemetery). She visited the Millar site; liked it and selected a particular spot. She accepted the quoted burial charge of $180 which included a casket. Dr. Joseph Millar said that the hospital had been there for years and that she could visit the pet's grave any time she wished; that "the cemetery would be there always." After the burial she had a headstone installed to mark the site and also reserved a spot alongside for the ultimate burial of her other dog, "Jolie". "Jolie" died in 1983 and was buried in that spot. At that time Dr. Harry Millar told her that "the pet cemetery would be there, forever." She did not ask what would happen to the pet burial ground if the animal hospital happened to go out of business.

Patricia Woods lives in Bayonne. She became aware of the existence of the Millar's pet burial ground upon inquiry of her veterinarian when her dog "Barry" died in June, 1981. She spoke to Dr. Harry Millar over the telephone. He told her that the burying ground "was a permanent and final resting place for animals". She paid $157.50 for the casket and burial; was there for the interment; did not erect a monument and has not returned since.

John Coblan lives in Bedminster. When his dog "Major" died in 1971 he "called around" to inquire about pet cemeteries. The Millars' name was given him. He visited the facility and

liked its looks. There were no signs advertising the site as a "Pet Cemetery". He spoke to Dr. Joseph Millar and asked if the cemetery would always be there. He specifically asked if it would ever be paved over "and made into a McDonald's." Dr. Millar's answer was "No, it will never be." He paid $100 for box and burial and later had a modest monument put in place. He returned to visit the spot about twice a year for the first 10 or 11 years but has not returned thereafter.

Mary McAleer lives in Lakewood. Between the late 1960s and 1981 she has buried six dogs (five Irish and one English setter) and one cat there. She did not recall how she first became aware of the Millar facility. The cost for dog burials varied between $200 and $225; the cat cost $125. Each dog has a permanent marker; not so the cat. She faithfully visits the grave sites and keeps flowers on the graves. She confirmed that there are no signs designating the area as a "Pet Cemetery" nor did the hospital ever give out a brochure describing the services and the burial site. She never discussed the future of the cemetery with the Millars. She was told that she was free to visit at any time.

When the last pet was buried in 1981 the caretaker-grave digger told her, "Don't bring any more pets here; Dr. Millar wants to sell." Her expectations were that the cemetery would be there for at least the length of her life. She never inquired what would happen if the animal hospital were sold.

Carole Tesauro lives in Neptune. Her dog "Brownie" was not a Millar patient. It died in October 1983. Her family is in the funeral home business. Her husband spoke to Dr. Harry Millar about burying the dog. Millar said to bring it in. The fee for box, grave digging and burial was $250. She expected that the cemetery would remain "forever" just as in the case of human cemeteries. She had no conversations in that regard with the Millars. She still visits the grave often. There are no "Pet Cemetery" signs.

Barbara Lupinski is from New Brunswick. Her beagle "Stupid" was in failing health in July 1978. She heard of the Millar facility from a co-worker; called Dr. Joseph Millar and arranged for a visit. She and her mother liked the cemetery. Dr. Millar suggested they pick out a grave spot for the dog. In August they brought the dog to Millar to be "put to sleep" and buried. The interment charge was $152.75. The mother stated to Millar "This is going to be forever, right?" He said "Yes". The Lupinski's installed a flush-with-the-ground marker. They never visited the grave site thereafter until receipt of the letter of July 30, 1988. Then they removed the marker but not any remains. She believes that the remains should be undisturbed "forever".

Ronald O'Neill's dog "Scotty O'Neill" was a patient of the Millar Animal Hospital. In September 1975 the dog was obviously ailing. Dr. Joseph Millar mentioned the cemetery in the rear of the property. When the dog died in July of 1976 he had it buried for a fee of $100. He asked for how long a time pets had been buried there. Dr. Joseph Millar replied, "As long as the hospital has been here." When asked if the buried pets would remain there forever, Dr. Millar stated, "Yes, forever—for as long as the hospital is here." O'Neill has returned from time to time to visit the grave site.

Harry C. Millar II testified. Both his father and grandfather are dead. As a young man, growing up on the premises, he had buried animals both in an open pit and in individual graves. He was fully familiar with the operations of the veterinary practice of the Millar Animal Hospital over the years as well as the burial of pets on the premises. For his part he stated that he never represented to those inquiring that the cemetery would last "forever". He did respond to inquiries of that nature, to the effect that the cemetery had been there as long as the animal hospital (and inferred that it would remain as long as the hospital remained).

He has no present intention of either selling the property or of disinterring any animal remains.

It is clear that the "pet cemetery" simply evolved with no formality. While it took on aspects similar to those of human burial grounds (and to those of commercial pet cemeteries) there were significant differences. The pet owners obtained no indicia of ownership of the burial spots. The hospital did not advertise availability of burial services in any fashion. The area was not laid out in identifiable plots. Space could not be reserved in advance. No maintenance or perpetual care charge was made.

A service was rendered for a fee. The fee included the construction of a wooden casket, the designation of a spot. in the burial ground free of discoverable prior remains, the digging of a grave, the burial of the pet and the placing of a wooden marker. The hospital owner gave permission for that use of his property and allowed free access thereto for the purpose of visitation as well as the placement of permanent markers as desired and as paid for by the various pet owners. There was nothing more.

Plaintiffs seek an injunction which would "forever" bar the property owner or his successors in title from 1) prohibiting access for the purpose of visiting grave sites; 2) disinterring any remains; 3) removing any grave markers.

The class of plaintiffs is closed. There have been no burials since 1984. The question of removing remains is or will quickly become moot. There is no practical purpose in trying to dig up that which is continually disintegrating. Nothing is forever.

It is clear that the vast majority of pet owners have not returned to visit the burial site. Many have died or have moved from the area. Based on the. trial testimony, the class of plaintiffs is reduced to the relatively limited number who do visit or who wish that the option to visit remain open to them. Of course when they die, all interest will cease. Succeeding generations simply will not know or care.

As plaintiffs argue, there is a certain parallel between human and animal burials. Until fairly modern times, most humans were buried near to the place where they died. As with animal carcasses, interment was required for sanitary purposes. In times of pestilence and of battle, open pit graves were a necessity. Only the rich and famous received notable tombs and were buried in a fashion calculated to ease their spirits into the hereafter. Landowners generally were buried on their lands; commoners in the common grave or Potter's field. The locations of their graves were forgot in a few generations. Highways, airports, shopping centers and the like now occupy the same ground.

With the development of formal religions many chose to be buried near to their place of worship or (in later times) in ground owned by the religious denomination they preferred. These burying grounds were considered sacred or hallowed and the common consensus was that such burials ought not be disturbed by future generations. Government supports that concept. See, generally, N.J.S.A. 8A:1–1 et seq.

Commercial burial arrangements arose. By virtue of contract and deed, and with government approval, individuals can buy a guaranteed resting place for their mortal remains and with "perpetual" care of the surroundings. Courts are fully capable of dealing with rights and obligations created in those circumstances.

■ Here we are not dealing with human remains. If deference is to be given to human remains—and there is a consensus in our society for that—the same cannot be said to apply to animals—no matter how much affection they have engendered in the hearts of their owners. If the owner wishes something of a permanent nature for his or her pet's remains, the owner may contract for and pay for that. There are commercial pet cemeteries available. The plaintiff owners here chose not to do so.

The plaintiffs seek a declaration by the court that the cemetery and the pet remains be retained in their present state and remain accessible to plaintiffs for visitation for such period of time as the court deems commensurate with terms such as "forever" and "permanent". They do not seek an injunction for "perpetual care" of the site. They apparently seek an injunction against removal of headstones and markers but must concede that there was absolutely no proof of any agreement with regard to them. They sought permission from the owner and it was granted. There was no adverse user; there was no agreement (express or implied); there was no consideration to support any contract right.

The plaintiffs concede that it is unrealistic to demand a legally-imposed requirement that the ground remain undisturbed "until the end of time". Their practical position is that the court protect the land as a pet cemetery for a span of time measured by the life of the last surviving pet owner—whatever that may be or however that might be determined.

To thus state the relief sought is to immediately make clear that no court could, under the law, do so. Neither should a court, in the exercise of an unrestrained sense of "equity", do so.

Ownership of real estate in fee simple absolute is probably the most fundamental tenet of the Anglo–Saxon Common Law, adopted by this state and this country at the time of the American Revolution. In listing the absolute rights of individuals, Blackstone in his Commentaries on English law, number three—the right of personal security, the right of personal liberty and the right of private property. The third he defines in this fashion:

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution save only by the laws of the land. *1 Bl.Comm. The Rights of Persons Ehrlich Ed. p. 41.*

An owner is free to do with his property what he wills—absent criminal intent, constitutional limitations, or liability for tortious

activities in connection therewith. There is a firm public policy against judicially-created rights in strangers to the ownership by way of easement or of restrictive covenants running with the land. *Hammett v. Rosensohn,* 46 *N.J.Super.* 527, 535, 135 *A.*2d 6 (App.Div.1957). Anyone claiming such rights can do so only if they can point to a written grant or contract by which the claimed rights were created. Testimony concerning some past oral understanding simply will not suffice. The Statute of Frauds (N.J.S.A. 25:1–5) taken over as part of the common law provides:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by some other person thereunto by him lawfully authorized.
>
> d. A contract for sale of real estate, or any interest in or concerning the same; or
>
> e. An agreement that is not to be performed within one year of the making thereof.

Absent the writing, a claim may not be addressed by a court. The Statute is a complete bar to the action (absent certain well-defined exceptions, none of which is applicable to this case). The most that any of the plaintiffs received from defendant or his father or grandfather was a receipt for monies paid for a "burial". There is no writing from which a court could find either a grant of a restrictive covenant affecting the land or of an easement to come upon the land (much less the specific terms of either).

■■ If one were to assume that the Statute of Frauds did not exist, plaintiffs then seek the enforcement of an oral contract, the essential terms of which would be "If you pay me a burial fee, I promise that the land in which your and others' pets are buried, will remain as an undisturbed pet cemetery, forever, and that you will have access to the same over lands adjacent thereto from a public road to visit whenever you wish, forever, and further, that if you put a marker on the spot, you will be able to maintain it forever". Indeed, logically, plaintiffs' argument should encompass an additional promise which

would bind the defendant and his successors in title to maintain the area, forever. To argue for such a result based on the evidence presented is preposterous. There is no evidence from which such a detailed agreement can be inferred. It cannot be inferred because that is not what people say in a serious vein or do. It is not what was agreed to by the doctors and pet owners here.

Injunctive relief to compel compliance with a contract—to grant specific performance thereof—may not be granted unless the terms of the agreement are established by evidence with reasonable certainty. *Alnor Construction Co. v. Herchet*, 10 *N.J.* 246, 250, 90 *A.*2d 14 (1952); *Barry M. Dechtman, Inc. v. Sidpaul Corp.* 89 *N.J.* 547, 552, 446 *A.*2d 518 (1982). There is simply no competent evidence which does so here. Attributing accuracy of memory to the plaintiffs who testified; ignoring the human tendency to emphasize the favorable and disregard the unfavorable; putting aside the interest which the plaintiffs have in an outcome favorable to them, the only evidence produced is that attributed to each in their testimony set forth above. When they brought their pets for burial and inquired of the owners as to how long the cemetery would last they were told that "it had been there for 50 years and wasn't going anywhere"; that it would "always be there"; that it "would be there, forever"; that "it was a permanent and final resting place for animals"; that it would "never be made into a McDonalds"; that "it would be here as long as the hospital is here". Some pet owners never asked. They assumed the cemetery would be there, at least for such time as they desired to visit.

Those expressions are not contractual terms. They are "friendly assurances" as described in the case law. *Esslinger's Ind. v. Alachnowicz*, 68 *N.J.Super.* 339, 344, 349, 172 *A.*2d 433 (App.Div.1961). There was no bargaining process. There was no statement by an owner "I will not pay for a burial unless you promise that the gravesite be undisturbed forever". There were merely assurances given to a bereaved pet owner that the

pet's remains (as long as they "remained") would be undisturbed in the burial site—a term connoting time of a short duration rather than "forever".

■ It is possible to have a court imply the existence of a contract based on the circumstances and actions of the parties, as well as what they said to each other. That legal concept does not help the plaintiffs. Defendant and his predecessors did nothing other than box and bury the various pets for a fee and thereafter permit the owners to visit. It cost the doctors nothing and seemed like a nice thing to do. Grass had to be mowed whether it covered pet remains or not. The underlying problem remains—should an agreement of sorts be found, how could a court specify its terms. Such agreement if it existed would not be one but many and would depend on the circumstances, actions and words used in the interchange between doctor and individual pet owner.

■ It is likewise legally possible to imply the existence of a contract by operation of law—an equitable principle to prevent someone from being unjustly enriched at the expense of another. The Millars were not unjustly enriched. They did not advertise or seek out burials. They rendered a simple service. They charged a small amount. They allowed visits and permanent markers thereafter. They understood the deep affection which some owners had for deceased pets and were not harmed by extending kindness in that regard.

■ The last ground for relief relied upon by plaintiffs is the Consumer Fraud Act (N.J.S.A. 56:8–1 et seq.) That act became effective on July 4, 1960. Its terms are inapplicable to the arrangements for a pet burial made prior to that date.

As to burials which took place thereafter, the law does not apply based on its terms. The Millars never advertised a pet cemetery service. N.J.S.A. 56:8–1(a). What they did does not fall within the definition of "merchandise" under the Act which is defined, in N.J.S.A. 56:8–1(c) as:

The term "merchandise" as used in this act shall include any objects, wares, good, commodities, services or anything offered, directly or indirectly to the public for sale".

The burial of pets for a fee was a service offered for a fee if requested by clients of the veterinary practice and not refused to outsiders who came to inquire if it were available to them. It was not a service "offered directly or indirectly to the public".

The heart of the Act is N.J.S.A. 56:8–2 which, in pertinent part, provides:

The act, use or employment by any person of any ... false promise, misrepresentation ... in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; ...

Discussions about the future of the pet cemetery, whatever their nature, were not in connection with the sale of "merchandise" as noted, nor were they in connection with the sale of real estate. They were likewise not in connection "with the subsequent performance of such person" (the Millars), Harry Millar was free to sell his property at any time. He could not bind his purchasers to continue the pet cemetery absent a negotiated restrictive covenant running with the land. There was no such performance promised. The "subsequent performance" language of the statute refers to an affirmative representation of a future act by the promisor. On the facts of this case, the "friendly assurances" made by the Millars do not fall within the ambit of the statute.

Harry Millar does not intend to remove any pet remains. He has not charged owner-visitors with trespass and he does not threaten that. He does have the right to revoke permission to come upon his property. He has not done so. He does have the right, as set forth in his letter of July 30, 1988, to insist that pet owners remove their markers within a specified reasonable time and that for failure to do so they will be deemed to have abandoned them. Permissive use, once allowed, can now be

revoked. The property is his, unencumbered by any enforceable rights held by plaintiffs.

For the foregoing reasons I determine that the plaintiffs have failed to establish a cause for action. Mr. Wenning will submit a form of judgment to that effect.