D & N PROPERTY MANAGEMENT & DEVELOPMENT CORPORATION, INC. d/b/a/ D & N Management Corporation, Inc. Plaintiff,

v.

THE COPELAND COMPANIES, Defendant.

The Copeland Companies, Defendant–Counterclaimant,

v.

D & N Property Management & Development Corporation, Inc. d/b/a/ D & N Management Corporation, Inc., Plaintiff–Counterclaim–Defendant,

and

Nicholas J. Mattera, Counterclaim Defendant.

No. 99 CIV.11440(CM)(GAY).

United States District Court, S.D. New York.

March 8, 2002.

---

Frank P. Allegretti, Rye, NY, for D & N Property Management & Development Corp., Inc.

Kevin J. McKenna, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York City, NY, for Copeland Companies.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MCMAHON, District Judge.

The following are this Court's Findings of Fact and amended Conclusions of Law. These written conclusions replace the Court's Findings of Fact and Conclusions of Law delivered orally on March 1, 2002.

### CONCLUSIONS OF FACT

1. Plaintiff D & N Property Management & Development Corporation, Inc. is a corporation formed and existing under the laws of the State of Florida and has done business as D & N Management Corporation, Inc. ("D & N"). D & N maintains an office located at 6971 North Federal Highway, Suite 301, Boca Raton, Florida (Mattera direct).

2. Copeland was at all times relevant herein a corporation duly authorized to conduct business in the state of New York and maintains an office in Elmsford, New York and a principal place of business at Two Tower Center, East Brunswick, NJ 08816–1063. (Chong, Luciano) Copeland was in the business of rendering, among other services, 401(k) Plan record-keeping and administration services. According to representations by defendant in court on March 1, 2002, Copeland is incorporated in Delaware.

3. Nicholas J. Mattera is an officer, director and Fifty (50%) percent shareholder of D & N. Dan Castle is an officer, director and Fifty (50%) percent shareholder of D & N (Mattera direct).

4. Mr. Mattera received a Bachelor of Science Degree in Accounting/Finance from Pace University, New York, New York in 1981. Mr. Matt-era has been employed by Bankers Trust Company from 1978 through 1983, with responsibilities in the 401(k) area. Mr. Mattera has also been employed by Erisco from 1983 through 1989, with responsibilities in the 401(k) area. Mr. Mattera has also been employed by Merrill Lynch from 1989 through 1991, with responsibilities in the 401(k) area. Mr. Mattera has also been employed by W.R. Grace & Co. from 1991 through 1995, with responsibilities in the 401(k) area (Mattera direct).

5. Mr. Mattera, through various closely-held corporations formed by him and others, has done consulting work for Towers Perrin, CoreStates Bank and Prudential Investments from 1995 through 1997 (Mattera direct).

6. Prior to September 19, 1997, Mr. Mattera through D & N had discussions with Copeland regarding a potential consulting assignment with Copeland. Mr. Mattera's discussions were with Winthrop Cody, the Chief Information Officer of Copeland (Mattera direct; Cody direct).

7. Mr. Cody was authorized by Copeland to hire all employees and consultants under his supervision (Cody direct; Chong direct).

8. On or about September 19, 1997, D & N and Copeland entered into an agreement wherein D & N agreed to provide full-time consulting services for Copeland in the area of Copeland's administering of 401(k) plans (Mattera direct; Cody direct).

9. The consulting assignment, as reduced to a writing, was limited in duration and going at least until the end of April, 1998 and contained a daily rate of compensation in the

amount of $875.00 (PX 1; Mattera direct; Cody direct).

10. Mattera is the sole employee of D & N with any involvement in its consulting business and was the sole representative of D & N to provide consulting services to Copeland or otherwise to interact with Copeland with respect to the relationship between Copeland and D & N. (Mattera, Cody, Luciano & Chong)

11. Copeland retained the original document dated September 17, 1997 that contained the agreement for D & N to perform consulting services for Copeland (Mattera direct; Cody direct)

12. D & N performed its obligations under the consulting agreement by having Mattera work at the offices of Copeland in East Brunswick, New Jersey on a full-time basis (Mattera direct; Cody direct; Chong direct).

13. During the entire length of D & N's consulting assignment with Copeland, D & N was not bound by any restrictive covenants or non-compete clauses (Mattera direct; Cody direct; Luciano direct).

14. During the entire length of D & N's consulting assignment with Copeland, D & N never received any employee/consultant manuals or guides from Copeland, nor any code of conduct, standard of conduct policy, compliance manual or any memorandum or other communication regarding policies, procedures, rules or regulations of Copeland (Mattera direct; Cody direct; Luciano direct).

15. The original consulting contract expired by its terms at the end of April 1998. Mattera and Cody entered into negotiations during May of 1998 to extend its term. Pending completion of a new written agreement, the parties agreed that D & N (through Mattera) would continue to work as per the terms of the expired consulting agreement. (Mattera direct; Cody direct).

16. Mattera advised Copeland that D & N desired a long-term commitment from Copeland regarding the consulting services (Mattera direct; Cody direct).

17. On or about May 15, 1998 (the "May 15 Letter"), D & N sought a two-year extension of the parties' consulting relationship—running through May 2000—and with an increased daily billing rate "based on market conditions" for the second year of the proposed extension.

18. On May 29, 1998, Mattera prepared and presented Cody with a letter proposing an extension of the expired contract through the end of 1999, at a rate of $875/day for the remainder of the year 1998 and at a rate of $945/day for the year 1999.

19. Between May 29 and June 1, 1998, Cody marked up the agreement to commit Copeland to use D & N only through June 30, 1999, with arrangements for the rest of 1999 to be determined at a later date. Cody also changed language in the proposal concerning the possible installation of the SunGuard System, indicating that Mattera would "assist in" its installation, not "manage" the installation. Cody delivered this document back to Mattera. Cody made the changes in his own handwriting, but he did not countersign the document on the "accepted and agreed" line prior to delivering it back to Mattera. (DX 34; Mattera direct; Cody direct).

20. Mattera initialed Cody's handwritten changes to the May 29 letter and re-

delivered the document to Cody (DX 34; Mattera direct). At that point, the letter had still not been countersigned by Cody on the "accepted and agreed" line.

21. Cody never signed the May 29, 1998 letter.

22. On or about June 10, 1998, Mattera typed and delivered to Cody a new letter. This letter incorporated all the terms of the May 29, 1998 letter as altered by Cody and initialed by Mattera. (PX 3; Mattera direct).

23. Cody crossed out the typed statement that the term would extend from January 1, 1999 through June 30, 1999 and wrote the following by hand on the document: "okay through 12/31/98, extension to 1999 to be determined at a later date." (PX 3; Mattera direct).

24. Mattera never countersigned, initialed, or otherwise indicated that he consented to Cody's change to the June 10 letter.

25. Copeland's budget for the calendar year 1999 was drafted during the third quarter of 1998 and finalized during the fourth quarter of 1998.

26. Also in the fourth quarter of 1998, Mattera and Cody and Donna Luciano of Copeland reopened discussion about a contract extension. In early December 1998, within the context of those discussions, Cody raised for the first time the prospect of Mattera providing services to Copeland on a "part-time basis" in 1999. (Dx–35, Dx–37, Cody and Mattera)

27. In response to Cody's offer, Mattera sent him a letter dated December 14, 1998, professing to have been "confused" by Cody's comments regarding the possibility of Copeland's using Mattera's services on a part-time ba-sis in 1999, because Mattera already had a contract extending through 1999 at the rate of $945/day. (the "December 14 Letter"). Mattera asserted that he allegedly had "all the correspondence regarding the extension of [his] contract reviewed" by a lawyer [his brother] and that the alleged review "confirmed" Mattera's purported "understanding" that his contract had been extended through December 31, 1999 at a daily rate of $945. (Dx–35, Dx–37, Cody and Mattera)

28. Along with the December 14 Letter, Mattera enclosed a copy of a document dated June 24, 1998, which set forth the terms described in the preceding finding of fact. Mattera also copied Donna Luciano on the December 14 Letter with a copy of the June 24 Letter he enclosed therewith. (Dx–37, Cody and Mattera)

29. Throughout the November—early December 1998 period in which the parties were discussing a potential extension of the expiring June 10 Agreement, Mattera never raised the alleged June 24 Letter or its purported terms to Cody or Luciano prior to its appearance together with the December 14 Letter. (Dx–35, Px–10, Cody, Luciano and Mattera)

30. It is neither logical nor credible to conclude that Cody, having cut back Mattera's May 29 proposal from all of 1999 to half of 1999, and then having attempted to finalize a deal running only through 1998, would change his mind only a few days after altering the June 10 letter and offer Mattera employment at an enhanced rate through the entire year 1999. I thus conclude that the June 24 letter was not prepared by Mattera in June 1998 and was not circulated to anyone

from Copeland at that time. I conclude that it was prepared after Cody proposed to Mattera that he be cut back to part-time status in early December 1998. I further conclude that Cody's purported signature thereon was either forged or scanned onto the document, and was not placed there by Cody. I further find that the first time that Donna Luciano or Cody ever saw or heard of the purported June 24 Letter was when they received it in connection with the December 14 Letter. (Dx–37, Cody and Luciano)

31. Even after the appearance of the June 24 Letter in mid-December 1998, and despite the fact that Cody and Luciano believed that the document was a fraud, the parties continued to discuss a possible extension of D & N's consulting arrangement. Mattera offered several more proposals, each of which was too rich and too long for Copeland. Finally, on our about January 15, 1999, when Copeland formally advised Mattera that it no longer needed his consulting services and that he was not to report to Copeland's offices on January 18, 1999 or thereafter. (Px–10, x–11, Cody, Luciano and Mattera)

32. Copeland paid Mattera for the days he worked for Copeland in January 1999 at the billing rate of $875. Several months after the check was sent to him, and in contemplation of the filing of this action, Mattera sent Copeland a letter protesting that the amount was too low.

## CONCLUSIONS OF LAW

1. The only possible written contract between D & N and Copeland is the May 29, 1998 letter as marked up by Cody and initialed by Mattera.

The June 10 letter cannot possibly be a contract, because Mattera never indicated his assent to that arrangement. Plaintiff argues that Cody's handwritten changes to the May 29 letter constituted a counteroffer and that Mattera's initials next to the counteroffer constituted an acceptance of the counteroffer. Defendant argues that the May 29 letter is not a counteroffer because Cody never signed it and never indicated his assent to be bound by his handwritten changes. Defendant argues that there was no binding counteroffer and the handwritten changes were merely proposals.

2. Defendant argues that the circumstances surrounding the May 29 letter—the fact that the parties had just begun negotiations, the fact that Mattera initiated many other contract negotiations after this alleged contract was executed, the fact that neither party relied on this contract, and the fact that Mattera forged contracts at a later date—all should lead this court to conclude that no reasonable person would have believed the May 29 letter, as marked up by Cody and initialed by Mattera, to be a binding contract.

3. Under New Jersey law, the issue of whether an offer has been made becomes "whether the one to whom the proposal was made had reason to believe that it was intended as an offer." 1 *Farnsworth,* ¶ 3.10, at 237.

4. Thus, whether Copeland, through Cody, made a counteroffer to Mattera by changing some of the terms on Mattera's May 29 offer, but not signing or initialing the marked-up letter, does not depend on what Cody subjectively intended, or upon what

Mattera believed that Cody meant, but rather "upon what meaning the [marked-up letter] should have conveyed to a reasonable person cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances." *Esslinger's Inc. v. Alachnowicz*, 68 N.J.Super. 339, 344, 172 A.2d 433, 436 (App.Div.1961); *Broad St. National Bank of Trenton v. Collier*, 112 N.J.L. 41, 44, 169 A. 552 (1933), *aff'd o.b.*, 113 N.J.L. 303, 174 A. 900 (1934).

5. Under New Jersey contract law, evidence of the circumstances surrounding the alleged contractual transaction is admissible in aid of the interpretation of an alleged agreement, even where the terms of the alleged agreement itself are free from ambiguity. *Western Slope Telecommunications Consultants, Inc. v. Telephone Data Communications, Inc.*, 1991 WL 186682, at *3 (D.N.J. Sep.16, 1991); *Newark Publisher's Ass'n v. Newark Typographical Union*, 22 N.J. 419, 427, 126 A.2d 348 (1956).

6. Evidence of surrounding circumstances is admitted not for the purpose of changing the agreement, but to "secure light by which its actual significance may be measured." *Id.*

7. Likewise, "the conduct of the parties after execution of the contract is entitled to great weight in determining its meaning and significance." *Joseph Hilton Assoc., Inc. v. Evans*, 201 N.J.Super. 156, 171, 492 A.2d 1062 (App.Div.1985).

8. In this case, it is necessary to resort to evidence of the parties' other dealings in order to ascertain whether a reasonable person who was cognizant of all the antecedent and surrounding facts and circumstances would consider the marked-up May 29 letter to be a valid and binding contract.

9. I conclude, based on the credible evidence and in light of the findings of fact previously announced, that the marked-up May 29 letter was not a valid and binding contract. The facts that persuade me of this are as follows:

a. First, Mattera had an unvarying practice of asking Cody to indicate his assent to a contact by signing his name under the words "Accepted and Agreed to." DX 34 indicates that, as of the time Mattera initialed Cody's changes to his May 29 letter, Cody had not so signed the May 29 letter.

b. Second, Cody's signature on the "Accepted and Agreed to" line was added to the document at an unknown date sometime after June 1, by Mattera and not by Cody, thus suggesting that Mattera did not believe the document in its June 1, 1998 state (i.e., DX 34) would be upheld as a valid and binding contract.

c. Third, on June 10, Mattera prepared a freshly typed version of DX 34, incorporating Cody's suggested changes, and returned it to Cody for signature. I do not accept Mattera's testimony that he did this only to "clean up" the already agreed contract. Mattera begins the "cleaned-up" letter by referring to a June 8 conversation with Cody that he asserts was the basis for the terms that follow. That reference is not consistent with his statement that he only wanted to "clean up" an already-existing agreement who terms were allegedly agreed well prior to June 8. Moreover, the preparation of the June 10 letter is consistent with the fact that, as of that date, Cody had not

signed DX 34. I find that Mattera wrote the letter precisely so that Cody would sign something firmly indicating that his contract would be extended at least until June 1999. That did not happen.

    d. Finally, while New Jersey's recent repeal of the statute of frauds means that the May 29 letter could have created a binding contract, even without Cody's signature, the lack of a signature is still of some significance. Cody's failure to sign, or even initial, the changes he made to the May 29 letter is at variance with his practice in connection with all the other Mattera letters that he either signed or changed. [Sept. 19, 1997 letter (DX–38, PX–1); June 10, 1998 letter (DX–36).]

10. I draw no inferences from the letter dated June 24, as I have found that that letter was not created at or about the date indicated on the document.

11. Plaintiff argues that the decision in *Jeshiva v. U.S. Mattress Corp.*, Civ. No. 93–4464, 1994 U.S. Dist. LEXIS 6592 (D.N.J. Jan. 13, 1994) is directly relevant to Mattera's claims.

12. In *Jeshiva*, defendant and plaintiff were in negotiations for an employment contract. Defendant presented plaintiff with a preliminary three-page handwritten and unsigned "Compensation Proposal." Plaintiff argued that the proposed salary was not commensurate with his expectations, and defendant, during an in-person meeting, presented plaintiff with an amended handwritten and unsigned "Compensation Proposal," which incorporated many terms of the previous proposal in addition to the salary amendments. Plaintiff relied on this second proposal, resigned from his former job, and began working with defendant at the compensation indicated on the proposal. Eight and one half months later, defendant terminated plaintiff's employment. Plaintiff sued for breach of contract. Defendant argued that he never intended the Compensation Proposal to be a contract, but did concede that he never made plaintiff aware of this fact. Plaintiff argued that he relied on the proposal, defendant knew that he relied on this proposal because plaintiff quit his job to begin working at defendant's office, and defendant paid him the specific amounts listed in the Compensation Proposal. The court found that, in light of all of the circumstances, an offer had been made.

13. *Jeshiva* is easily distinguished from the present situation. First, there is no evidence in this case that Mattera changed his position to his detriment in reliance on DX 34. I have found that the parties agreed to continue him as a consultant under the terms of his expired agreement until they could reach some sort of agreement. So Mattera did not rely to his detriment on anything in DX 34. The plaintiff in Jeshiva, by contrast, relied to his detriment by resigning his position and coming to work for the defendant, who not only did not indicate that he had never intended to make an offer but accepted plaintiff's services and paid him the compensation indicated in the written proposal. Thus, a reasonable person who was aware of all the surrounding facts and circumstances would conclude that the defendant was not acting out of the goodness of his heart, and that parties had agreed to the Proposal's terms.

14. Finally, the fact that Mattera falsified a letter in late 1998 that he pre-dated June 24, 1998, leads the court to conclude that Mattera never believed that DX 34 was a binding contract.

15. I find that the facts of this case, examined objectively, lead to the conclusion that it was not reasonable for Mattera to believe that Cody's unsigned handwritten changes were a binding offer. The handwritten changes were part of an ongoing negotiation over a possible contract extension, and that is all. Mr. Mattera's subsequent forgery of Cody's signature on DX–34, and his completely forged submission in DX–36, further bolster his ineffective and disingenuous claim that DX–34 constituted a binding contract.   •

16. The June 10 letter as altered by Cody was never agreed to be Mattera. The fact that Mattera continued to render services after June 10 can be explained by the fact that the parties had already agreed (orally) to continue under the terms of the expired September 1997 written contract until they agreed to a new contract. They did not do so on June 10 and were thus operating on a day to day basis throughout the year 1998 without benefit of any written contract.

17. There are no binding written contracts between D & N and Copeland. Copeland was free at any time to decide that it no longer needed Mr. Mattera's services.

18. The rate agreed to in the absence of a written contract was $875 per gay as set in the September 1997 contract. Thus, Copeland paid D & N everything to which it was entitled.

On the basis of these findings of fact and conclusions of law, I give judgment to the defendant on the claim and order it dismissed. The counterclaim against Mr. Mattera has been withdrawn so the defendant takes nothing on the counterclaim, the plaintiff takes nothing on the claim. Each party to bear its own costs in connection with this litigation.

This constitutes the decision and order of this Court.

The clerk of court is instructed to close this case.